100 F.R.D. 354
United States District Court,
E.D. Pennsylvania.

COMMONWEALTH of Pennsylvania

v.

Joseph F. O'NEILL, et al.

Civ. A. No. 70–3500.
|
Nov. 17, 1983.

**Synopsis**
Parties to Title VII action presented proposed consent decree for approval. The District Court, Fullam, J., held that proposed consent decree to remedy perceived discrimination against blacks in hiring and promotional practices of police department would be approved.

Order accordingly.

**Attorneys and Law Firms**

**\*354** Alan F. Klein, Philadelphia, for plaintiffs.

John M. Myers, Philadelphia, for City of Philadelphia.

**\*355** MEMORANDUM AND ORDER

FULLAM, District Judge.

More than 13 years ago, plaintiffs brought this action to remedy perceived discrimination against blacks in the hiring and promotional practices of the Philadelphia Police Department. After years of litigation, addressed sequentially to various aspects of the overall problem, the parties have now presented for approval a proposed Consent Decree which would grant various forms of class-wide relief, and which would end the litigation.

The background may appropriately be summarized as follows: The litigation stemmed from a review by the Commonwealth of Pennsylvania, Department of Justice, and others, of some remarkable statistics. In the early 1960s, more than 20% of Philadelphia's police force were black. In 1966, 27.6% of the new appointees to the police force were black. At that point, responsibility for the selection process was transferred from the Civil Service Commission to the Police Department itself. By 1970, the percentage of black appointees had dropped to 7.7% in Philadelphia, whereas other major cities were experiencing marked increases in the percentage of successful black applicants for police appointments.

The initial round of litigation addressed the hiring process. After extensive hearings, this court concluded, in 1972, that the entrance examination had a disparate impact upon blacks, but had not been validated as job-related. The net result of this conclusion was the retention, by the City, of Educational Testing Service to develop and validate a new entrance examination. *Commonwealth of Pennsylvania v. O'Neill,* 348 F.Supp. 1084 (E.D.Pa.1972), *aff'd in part,* 473 F.2d 1029 (3d Cir.1973). Since that time, the City has worked closely with its outside consultants and its own personnel experts in developing and monitoring, and seeking to improve the quality of, the police entrance examination.

Another round of litigation concerned itself with the background investigation process, which tended to screen out a disproportionately high percentage of blacks who had passed the written entrance examination. This court ultimately determined that certain disqualifying factors being relied upon in the selection process had a discriminatory impact on blacks, and were plainly not job-related. In addition to prohibiting reliance upon these non-job-related factors, this court provided additional relief, including a requirement of minority participation in the screening decisions, consultation with outside experts with a view toward revising and improving the screening criteria, and a review procedure. The review procedure contemplated that a rejected applicant would have the right of review by a three-person panel (two members of the Police Department, one of whom would be a member of the racial minority, and an impartial outside expert). A unanimous decision by this review panel would be final. A nonunanimous rejection would be appealable to this court for a determination as to whether the applicant's constitutional rights were being violated. (In practice, virtually all of the panel's decisions were unanimous; the few exceptions will be eligible for reconsideration, under the terms of the proposed consent decree.)

Another round of litigation challenged certain promotional examinations and procedures. In a 1979 decision, this court determined that the challenged examinations were valid. That litigation did not address itself to the examination for promotion to lieutenant.

In addition to the Commonwealth of Pennsylvania, the plaintiffs initially consisted of a class of past and future black applicants to the Police Department, and black members of the Police Department who had, or might in the future, apply for promotions. The defendants were the City of Philadelphia, its mayor, its police commissioner and personnel director. Early in the litigation, the Guardian Civic League, an organization whose members are black police officers of the City of Philadelphia, was permitted to intervene as a plaintiff. And, on August 10, 1971, the Fraternal Order of **\*356** Police, Lodge No. 5, was also permitted to intervene.

The precise status of the Fraternal Order of Police in this litigation can perhaps best be described as indeterminate. In its initial petition to intervene, the FOP and certain of its officers and members sought intervention "on behalf of all policemen of the Police Department, white and black, and all potential applicants for the Police Department, white and black." The stated purpose of the intervention was to protect the interests of all members of the Police Department by opposing, for the most part, the relief being sought by the plaintiffs. The intervenors asserted that their interests were not being adequately represented by the defendants. Thus, the application for intervention, taken literally, would have removed a large segment of the plaintiff class and re-aligned it as a defendant class. Needless to say, the order permitting intervention limited the FOP's role to representation of "the members of the class referred to in the Complaint [in a companion action, later consolidated, seeking injunctive relief] who did not wish to be members of the class represented by plaintiffs."

The FOP's active participation in the litigation was quite limited. Its principal efforts were directed to attempting to prevent plaintiffs from gaining access to personnel records of the Police Department, and to supporting the original defendants in their opposition to various forms of affirmative relief ultimately granted plaintiffs. Counsel for the FOP attended hearings only sporadically, and primarily as an observer.

The seeming ambivalence of the FOP throughout this litigation is understandable: The FOP professed support for the long-range goals of the plaintiffs, and many of its members were plaintiffs.

Beginning in 1980, serious settlement negotiations between the plaintiffs, the Guardian Civic League, and the defendants,

were pursued. Various drafts of proposed consent decrees were circulated from time to time, and many settlement conferences were held. The end product of this lengthy process is the proposed Decree now before the court for approval.

## I. STANDARDS FOR APPROVAL; BURDEN OF PROOF

The appropriate standards by which a proposed consent decree should be evaluated are well known, and need not be elaborately re-stated here. Before approving a proposed consent decree, the court must be satisfied that it is "fair, adequate and reasonable, and is not the result of collusion between the parties." *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977). Because a consent decree operates as a judgment, and will have future consequences, the court must also make certain that it does not violate public policy, and is not illegal or unfair. *See, e.g., Patterson v. Newspaper and Mail Delivery Union,* 514 F.2d 767 (2d Cir.1975), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976).

The court is required to consider the strengths and weaknesses of the respective positions of the litigants, the probable outcome in the absence of a settlement, the rights and positions of other parties affected by the proposed decree, and the number and quality of objections expressed. *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799 (3d Cir.1974).

It must be remembered, also, that in enacting Title VII of the Civil Rights Act (made applicable to municipalities in 1972), Congress evinced a decided preference for conciliation and voluntary agreement as the mechanism for resolution of employment-discrimination disputes. There is a presumption in favor of voluntary settlement of Title VII litigation. *Cotton v. Hinton, supra.*

## II. THE TERMS OF THE PROPOSED CONSENT DECREE

The proposed consent decree addresses all of the issues which have arisen in the course of this litigation. It memorializes solutions heretofore imposed or informally agreed to (involving such matters as an ongoing minority recruitment program, continued consultation **\*357** with outside experts in the testing field for the improvement and validation of entrance and promotional examinations, further monitoring of the background screening process, and continuation of the review procedure); contains detailed

provisions governing the hiring and promotional process over the near term; and provides limited affirmative relief to remedy the effects of past discrimination. In addition, it provides for periodic reports and monitoring in the future.

Because the desirability and appropriateness of most of the provisions of the proposed decree are self-evident and have engendered no controversy, I deem it necessary to discuss further only those provisions which were challenged at the approval hearing.

A. *Hiring.* An entrance examination was conducted on November 20, 1982. The certified eligibility list thus generated will remain in effect for a period of four years (rather than the normal two-year maximum), unless it becomes necessary to generate a new eligible list sooner in order to comply with consent decrees in other pending litigation involving female applicants and Spanish-speaking applicants (*U.S. v. City of Philadelphia,* C.A. No. 74–400, *Brace v. O'Neill,* C.A. No. 74–339, and *Sanford v. O'Neill,* C.A. No. 78–1154). But no applicant will be hired from this list after it has been in effect for two years, unless the applicant has achieved a score of 80 or above in the examination.

In an effort to dispel the effects of the discriminatory impact of previous tests and screening procedures, the defendants would commit themselves, subject to the availability of qualified black applicants on then-current eligibility lists, to hiring 293 additional black applicants (*i.e.,* in addition to those hired in rank order) over the next 2,442 hires, at the rate of 12 such additional black hires for each 100 hires.

B. *Promotions.* The proposed consent decree deals specifically only with promotions to the position of lieutenant. As noted above, the validity of the lieutenant's examination has not heretofore been litigated. There is a certified eligibility list currently in force, derived from a promotional exam administered less than two years ago, but the Guardian Civic League has challenged the efficacy of that list, on racial grounds, in proceedings before the Equal Employment Opportunity Commission (to be followed, if need be, by further litigation). The proposed consent decree resolves this problem as follows: The defendants have recently administered a new promotional examination for the lieutenant position, and it is contemplated that a new certified eligibility list will be available in February 1984. Before certifying the new eligibility list, the defendants will obtain, and make available to the court and counsel, an item analysis of this recent examination, by race (*i.e.,* an analysis which

shows how well or poorly the test-takers of each race fared on each test question). The written test will contribute 45% to an applicant's final score; an oral examination-interview will contribute 45% to the final score; and seniority will constitute 10%. When the new certified eligibility list is in place, the current eligibility list will expire. In the meantime, if any promotions to lieutenant are made from the current eligibility list, two such promotions are to be reserved for the highest-ranking blacks on the eligibility list.

In exchange, the Guardian Civic League would withdraw its EEOC complaint, and all plaintiffs would be precluded from challenging the new lieutenant's examination.

III. NOTICE AND HEARING

By Order entered September 19, 1983, this court directed that notice of the proposed consent decree and of the hearing which would be held to consider it be given (1) individually, by first-class mail, to the last known addresses of all black takers of the 1982 entrance examination, all black applicants rejected on the basis of a background investigation from April 10, 1973 to date, and all black takers of the 1982 lieutenant's examination, and (2) by publication, to the public generally. In addition, copies of the proposed consent decree were **\*358** directed to be sent to persons who would be eligible for re-consideration in connection with the background investigation review procedure. And, of course, the parties and their counsel received notice. There has been full compliance with these requirements, and there can be no question about the adequacy of notice, or about compliance with F.R.C.P. 23 and the due process clause of the Constitution.

Pursuant to these notices, an evidentiary hearing was held before the undersigned on November 10, 1983. The hearing was attended by an overflow crowd (variously estimated at between 200 and 300 persons). All persons who wished to be heard were given an opportunity to express their views.

IV. THE OBJECTIONS

Shortly after news of the proposed settlement appeared in the local press, the FOP filed suit in the Court of Common Pleas of Philadelphia County seeking to enjoin the proposed changes in promotional procedures as violative of the collective bargaining agreement between the FOP and the

35 Fair Empl.Prac.Cas. (BNA) 1776

City. The action was removed to this court, and the FOP has filed a Motion to Remand. The City has responded with a Motion to Dismiss or for Summary Judgment.

Shortly thereafter, a group of police officers on the current eligibility list for promotion to lieutenant (the "Gallagher plaintiffs") filed suit in the Court of Common Pleas of Philadelphia County, seeking to enjoin the defendants from holding the new examination for promotion to lieutenant, then scheduled for October 15, 1983. This action, too, was removed to this court, and motions to remand and to dismiss or for summary judgment are pending. However, a hearing on the application for preliminary injunctive relief was held on October 13, 1983. The injunction was denied, and the lieutenant's examination proceeded on schedule.

While certain issues raised by these two lawsuits remain open, and will be disposed of by separate opinions, the objections of the FOP and the Gallagher plaintiffs to the proposed consent decree were fully aired at the November 10 hearing, and will be considered in this Opinion.

In addition, a group of persons whose names appeared on the certified eligibility list for hiring, on the basis of a 1980 entrance examination (the "Floirendo plaintiffs") filed suit in the Court of Common Pleas of Philadelphia County, seeking to establish that the 1980 eligibility list is still in effect, and that they should be hired before any persons are hired from later eligibility lists. This action, too, was removed to this court, and the City filed a Motion to Dismiss. Counsel for the Floirendo plaintiffs was unable to appear at the November 10 hearing, and a further, separate hearing was held on November 14, 1983, to consider the issues raised by the Floirendo plaintiffs, and to permit them to express their objections to the proposed consent decree. At the conclusion of that hearing, on the basis of the incontrovertible fact that the 1980 hiring list had been in effect for two years as of March 1983, and therefore became a dead letter, the separate action brought by the Floirendo plaintiffs was dismissed. In the interest of completeness, I now reaffirm my conclusion that none of the contentions of the Floirendo plaintiffs based upon their status as passers of the 1980 entrance examination constitutes a valid objection to the proposed consent decree. To the extent that the Floirendo plaintiffs may be deemed also to have adopted the objections expressed by the FOP and/or the Gallagher plaintiffs, they need not be separately considered.

Turning now to the thrust of the outstanding objections, I note preliminarily that the failure of the settling parties to consult with the FOP or the Gallagher plaintiffs before agreeing to the proposed settlement is immaterial to the present decision. The FOP as an intervenor, and the Gallagher plaintiffs as persons affected, had the undeniable right to be heard before judgment, but that right has been fully accorded them.

It should also be noted that, as proponents of the consent decree have pointed out, there is a serious question as to the **\*359** standing of the FOP to object to those aspects of the proposed consent decree relating to entrance examinations, background investigations, and the hiring process in general, since the FOP represents only persons who are now members of the police force. But since all objections to the consent decree have been lodged by persons who do have standing, and in view of the relationship of the FOP to the Police Department and to this entire litigation, I believe it appropriate to consider all of the arguments presented, irrespective of the entity making the argument.

The provisions of the consent decree covering future promotions to the position of lieutenant have generated the following objections: (1) it is unfair to persons who passed the earlier lieutenant's exam and are on the current eligibility list, to terminate that list and replace it with the list stemming from the 1983 lieutenant's exam. (2) The provision reserving two lieutenant positions for black applicants is unfair to white applicants scoring higher on the lieutenant's exam, and amounts to reverse discrimination. (3) The new exam, and the resulting eligibility list, are or will be unfair, inappropriate, and/or unlawful because the final scores will depend in part upon an oral examination, involving subjective judgments. And (4) termination of the current eligibility list for the position of lieutenant, and the oral examination component of the new procedure, contravene contractual arrangements between the FOP and the City.

The objections to the provisions of the consent decree related to hiring may be summarized as follows: (1) the provision for hiring 293 blacks in addition to those who would be hired in rank-order from the eligibility list (spread out over the next 2442 hires, at the rate of 12 blacks per 100 hires) is unfair to whites on the eligibility list, and amounts to reverse discrimination. (2) The FOP should be consulted in the development and implementation of a minority recruiting process. (3) The periodic reporting requirements of the consent decree are inappropriate. (4) Certain aspects of the background investigation process are unfair to the applicants,

and should be changed. The latter two objections (reporting and background investigation details) were not pursued at the hearing, and may well have been abandoned. In any event, I perceive no significant merit in these objections.

It thus appears, not surprisingly, that the only arguably meritorious objections have to do with the provisions of the decree which provide a measure of affirmative relief to remedy past discrimination. The decree guarantees that 293 "extra" black officers will be hired over the next 2,442 hirings; and gives the City the option of either waiting for the new eligibility list for lieutenant or, if the City wishes to make promotions from the present list, requires that at least two blacks be promoted to lieutenant from that list. There are no blacks in the top 70 names on the current eligibility list for lieutenant; there are 3 blacks in the top 100 positions, 8 among the top 150, and 14 among the top 200 positions. Thus, if the City does choose to promote persons to lieutenant before the new list comes out in February, it is virtually certain that only two blacks will be included, unless more than 100 promotions are made; and this provision of the decree would not necessarily require preferential treatment for any black.

It is quite understandable that persons of the white race on the current eligibility lists for hiring or promotion would feel aggrieved if a lower-scoring black were to be granted preferential treatment. But the force of that argument is greatly diminished, in the present case, by several circumstances.

In the first place, there is ample authority for approving a voluntary settlement which does include such remedial measures to alleviate past discriminatory injustices. *Patterson v. Newspaper and Mail Delivery Union of New York,* 514 F.2d 767 (2d Cir.1975), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976); *Dennison v. Los Angeles Dept. of Water and Power,* 21 F.E.P. Cases 1120, 1122 (C.D.Cal.1979), *aff'd,* 658 F.2d 694 (9th Cir.1981); *EEOC v.* **\*360** *American Telephone & Telegraph Co.,* 556 F.2d 167 (3d Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978); *U.S. v. City of Philadelphia,* 28 F.E.P. Cases 1562 (E.D.Pa.1980).

More importantly, the present case does not actually present an example of preferential treatment. Neither the 1982 entrance examination, nor the current lieutenant's examination is immune from attack on racial-discrimination grounds. No one on the current eligibility lists can properly claim a vested right to employment or promotion in rank

order. The racially discriminatory impact of these and previous test procedures is manifest. If the criteria which have produced these disparate results could be shown to be job-related, then no unlawful discrimination has occurred, and the arguments of the objectors would be unassailable. The point is, however, that in the absence of further protracted litigation, the answer to that question is unknown.[1]

The major advantage of the proposed consent decree to the defendants, and the concomitant advantage to the objectors (not, perhaps, fully appreciated by them) is that the decree will put an end to recurrent and seemingly incessant and inevitable litigation challenging the various tests as they arise, thus enabling the defendants to achieve the necessary hirings and promotions in a stable environment. In effect, the defendants are agreeing merely to eliminate some of the discriminatory impact of the current and previous test procedures, and giving up the right to try to prove that the criteria which produced the discriminatory impacts are job-related. In exchange, the plaintiffs are agreeing not to litigate these matters to a conclusion (which, in their view, might well produce significantly greater minority hirings and promotions, back-pay awards, etc.); and, with respect to persons found entitled to relief from previous improper rejections based on the background screening process, plaintiffs are agreeing to forego back-pay awards, and most aspects of seniority and fringe benefits.

In the circumstances of this litigation, that strikes me as an eminently reasonable and sensible exchange. The relatively minor potential disruption in the rank-order of the successful applicants on the current eligibility lists seems a small price for the benefits achieved—benefits both to the minority candidates, who have potentially valid claims for significantly greater relief, and to the white applicants, whose chances for actual hiring or promotion will, as a practical matter, be improved if the consent decree is signed.

As the foregoing discussion suggests, I am persuaded that both sides have legitimate reasons for believing that their chances of ultimate success in this litigation are good. From the standpoint of the defendants, it can be argued that they have done everything in their power to ensure that hiring and promotional decisions are not tainted by racial considerations. From the standpoint of the plaintiffs, the substantial discriminatory impacts are obvious, and the only question is whether the defendants would be able to prove the job-relatedness of the criteria which produced the disparities.

Both sides recognize that there is room for disagreement among testing experts on these issues.

Everyone agrees that only qualified persons should be hired as police officers, or promoted within the police force. The proposed consent decree provides ample assurance that that principle will not be violated. The ability of the current testing procedures to distinguish between qualified and unqualified applicants is undoubtedly much clearer than their ability to detect genuine differences among applicants within a particular segment of the scoring spectrum. Slight differences in test scores probably have little or no significance.

Under applicable civil service regulations, a certified eligibility list must remain in effect for at least one year, and is void after two years. Persons certified as eligible **\*361** thus can lay claim to a legal entitlement to consideration during the first year of the list's existence. It is within the discretion of the defendants whether a list should remain open longer than one year. The current eligibility list for lieutenant has remained open for one year, and no one on that list has valid grounds for disputing a decision by the defendants not to extend it for the full second year. On the other hand, there is no compelling reason for precluding the defendants from choosing to prolong the life of the hiring eligibility list beyond the initial two years, in the context of an overall settlement of Title VII litigation. Extension of the list works to the advantage of persons whose names appear thereon.

Nothing in the proposed consent decree contravenes any contractual right of the FOP or its members. The FOP and other objectors may well be correct in preferring written to oral examinations, but it is not within the province of this court to dictate to the City those details of the promotion process. It is clear that oral examinations have been a feature of promotions to all ranks higher than lieutenant for many years. The decree obligates the defendants to carry out all aspects of the hiring and promotion process in a racially neutral fashion. There appears no significant likelihood that the oral examinations will be conducted in a discriminatory manner, and there are available remedies if that should occur.

No significant objections have been expressed by individual members of the plaintiff class. Two such persons filed written objections before the hearing, and, of the various class members who expressed individual views at the hearing, one or two others could perhaps be regarded as having objected to the decree. None of these objections has even arguable merit. Two of the objectors had been certified on previous eligibility lists, but had not been hired because their rankings were too low. Another complained that, by the time he was cleared for hiring he was overage and ineligible.

To summarize, I have carefully considered all of the objections to the proposed consent decree, but I am satisfied that the evidence decidedly preponderates in favor of approval of the proposed decree.

## V. CONCLUSION

The proposed consent decree will be approved. I believe the parties and their counsel are to be congratulated upon achieving a fair, sensible, and realistic resolution of the issues presented throughout this litigation.

## APPENDIX

## CONSENT ORDER

WHEREAS, this action challenging the hiring and promotional practices of the Philadelphia Police Department on racial grounds was instituted on December 21, 1970. The plaintiffs include the Commonwealth of Pennsylvania, representatives of a class consisting of all black applicants and prospective black applicants for employment in the Philadelphia Police Department, and a class consisting of all black police officers in the Philadelphia Police Department. The defendants include the City of Philadelphia, the Mayor, and the Police Commissioner. Subsequent to the initiation of this action, the Guardian Civic League and the Fraternal Order of Police, Lodge No. 5, intervened as plaintiffs;

AND WHEREAS, the named representative plaintiffs, the plaintiff classes, the Guardian Civic League, the Commonwealth of Pennsylvania (hereinafter "plaintiffs"), and the defendants, desirous of avoiding the burden and expense of further contested litigation and desirous of ensuring the promotion of equal opportunities within the Philadelphia Police Department, hereby agree and consent to the entry of this Order as a final order with respect to all of the remaining issues in this litigation;

AND WHEREAS, it is agreed that this Order is entered with their consent in full and complete settlement and satisfaction of all issues which were or could have been raised in this

litigation and that upon the **\*362** entry of this Order, and subject to the provisions of paragraph 9, this litigation is terminated with prejudice. Further, the Guardian Civic League agrees to withdraw with prejudice its complaint filed before the EEOC, No. 031823146, Guardian Civic League v. City of Philadelphia Police Department, challenging the validity of the 1982 police lieutenant promotional examination;

AND WHEREAS, The Court has determined that this Order is a fair, adequate, and reasonable settlement of this action, and that the obligations imposed upon the defendants by this Decree are proper under law, including 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* and the Constitutions of the United States and the Commonwealth of Pennsylvania, that none will result in discrimination under those statutes, and that each is within the Court's equitable powers under those laws;

NOW THEREFORE, this _____ day of _____, 1983, after full hearing and consideration of the matters before the Court, this final Order is hereby DECREED, with the consent of the parties:

I. INJUNCTION

1. The City of Philadelphia, its officials and employees (hereinafter "City") are enjoined from racial discrimination with respect to the hiring and promotion or terms and conditions of employment of police officers in the Philadelphia Police Department.

II. HIRING AND PROMOTIONAL EXAMINATIONS

2. The plaintiffs and defendants consented, on April 10, 1973, to a Decree, entered by this Court (hereinafter, "1973 Decree") recognizing that the City was in the process of obtaining a new written entrance examination for the position of police officer with the assistance and consultation of the Educational Testing Service of Princeton, New Jersey. The City has, since that time, maintained a consulting relationship with that organization.

(a). The plaintiffs and the defendants agree that the City of Philadelphia shall continue to retain the services of the Educational Testing Service of Princeton, New Jersey, or an equivalent independent outside test development organization

in a consultative capacity over the life of this Order to assist in the preparation of the written entrance examination administered for the position of police officer, so that, to the extent practicable, such tests are job-related and non-discriminatory.

(b). The City shall perform a racial differential item analysis on the results of the entrance examination and shall report the results of such analysis to the Court and the parties at least 20 days prior to the certification of the eligible list for the position of police officer.

(c). The certified eligibility list for the position of police officer created as a result of the open competitive examination administered on November 20, 1982, shall remain open and in use for four (4) years from the date of certification of that list, or until such earlier date as there is no longer a sufficient number of eligibles who appear on said list to satisfy the City's obligations under the Consent Decree entered on October 1, 1980, in *United States v. City of Philadelphia,* C.A. 74–400, *Brace v. O'Neill,* C.A. 74–339, *Sanford v. O'Neill,* C.A. 78–1154; provided that no hire shall be made after the expiration of two years after the date of certification of said list of any applicant with a score below 80.

(d). So long as the City complies with the obligations set forth in sub-paragraph 2(c), the plaintiffs agree that they consent to these provisions and shall not challenge the validity of the 1982 Civil Service examination for the position of police officer.

(e). The validity of the written entrance examination for the position of police officer administered in November, 1982, and of the certified eligibility list which will be based on the results of that examination, has not been litigated by the parties in this case. The Guardian Civic League maintains that the examination was discriminatory, not job-related, and does not comply **\*363** with the law. In order to settle all the outstanding matters in this action, all plaintiffs waive the right to challenge that examination, and the parties agree that approval of this decree by the Court does not require a finding by the Court that the November, 1982 examination was not discriminatory, was job-related, or otherwise complies with the law. None of the plaintiffs waive their rights to challenge any future examinations. Notwithstanding the class certifications on June 3 and 10, 1971, including, *inter alia,* all "Black applicants for the Police Department, and all potential Black applicants ... who have unsuccessfully sought or who will in future seek jobs ... within the Police Department," and

the reliance on this certification by counsel for the plaintiff class and the defendants, the execution of this order does not indicate any agreement by the Guardian Civic League that the named class representatives are, or have been at any time, representatives of all Black applicants for employment who were adversely affected by the 1982 entrance examination, nor of the power of the class representatives, therefore, to waive the rights of any member of such 1982 applicant subclass.

3(a). The City shall immediately develop and administer a new examination for the position of police lieutenant which shall contain an oral component and a written component scored as 45% oral, 45% written, 10% seniority. At least one member of each panel for the oral component shall be a minority member. The current certified eligibility list for the position of police lieutenant shall expire upon the certification of the list resulting from the administration of the new examination, which the City will use its best efforts to accomplish by February, 1984.

(b). Among the promotions to be made during the remaining life of the current certified eligibility list for the position of police lieutenant, two promotions to the position of police lieutenant shall be reserved for the highest ranking minority persons on the list.

(c). The City shall perform racial differential item analyses on the result of each written promotional examination for the position of corporal, sergeant, detective and lieutenant during the life of this Order, and shall make such analyses available to the Court and counsel for plaintiffs.

(d). The Guardian Civic League shall withdraw with prejudice its EEOC Complaint, No. 031823146, Guardian Civic League v. City of Philadelphia, challenging the validity of the 1982 Civil Service examination for the position of police lieutenant.

## III. PSYCHIATRIC EXAMINATION

4(a). The City shall promptly engage the services of an independent, qualified organization or firm to review the current psychiatric screening procedures and standards for the position of police officer and, if necessary, to recommend improvements therein, so that, to the extent practicable, such procedures and standards are job-related and non-discriminatory. The City shall report to the Court and counsel

for the plaintiffs within six months of the date of this Order, describing the recommendations and changes proposed, if any, in the psychiatric screening process.

(b). Pending the development of the evaluation and any report as provided above, the City shall keep a record of all rejections of applicants for the position of police officer based upon psychiatric evaluation, which records shall include all documents developed in the evaluation process and the identity of the personnel recommending such rejection.

## IV. BACKGROUND INVESTIGATION PROCESS

5(a). The City shall adopt the following procedures with respect to background investigations undertaken by the Police Department as part of the hiring process for the position of police officer:

(1). The City shall promptly engage the services of an independent, qualified organization or firm to review the use of the polygraph by the Police Department in the **\*364** background investigation and, if necessary, to recommend improvements in the use of the polygraph, so that its use is, to the extent practicable, job-related and non-discriminatory. A report shall be submitted to the Court and counsel for plaintiffs within 90 days of the date of retention containing a description of the investigation made and recommendations regarding the role and use of the polygraph in the background investigation.

(2). The City in writing shall inform all applicants for the position of police officer in advance of completing the Personal Data Questionnaire or its equivalent that they are subject to polygraph examination by the Police Department during the background investigation, and in particular, that such examination will be conducted with regard to their responses to questions involving the illicit possession and use of drugs and prior criminal record, including any expunged arrests and convictions which may have been reversed on appeal or as to which a pardon was granted.

(3). The use of polygraph examinations by the Police Department in the background investigation process shall be governed by the following procedures:

a. The applicant shall be notified promptly in the event that, in the opinion of the polygraph examiner, deception has been indicated in response to any question.

b. The applicant shall then be given an opportunity to make an explanation, denial, or admission of the indicated deception.

c. In the event an applicant denies the deception or presents, in the examiner's judgment, an unsatisfactory explanation, he or she shall be informed of the right to request a second polygraph examination by a different polygraph examiner who shall not review the results of the first polygraph examination. If the applicant admits the deception, then he or she may be subject to disqualification for employment as a police officer.

d. If the results of a second polygraph examination indicate deception, the results may be taken to be final and conclusive, and the applicant may be subject to disqualification for employment as a police officer. If the results of the second polygraph examination do not indicate deception, the applicant shall be considered as having passed the polygraph examination. The City shall maintain all polygraph tapes and records for each applicant until a final decision in the matter by the Background Investigation Review Panel (hereinafter "Review Panel") or the Court pursuant to the 1973 Decree.

e. The City shall maintain a log or other record for each polygraph examiner reflecting the identity by race of each applicant to whom a polygraph examination was administered, the date of each examination, and the results of each examination.

(4). The factors which shall be considered in the background investigation process in evaluating an applicant for employment as a police officer shall be as follows: (1) criminal record or conduct; (2) military service record; (3) prior employment record; (4) consumer credit record; (5) alcoholism or drug use; and (6) material and intentional falsification.

(5). All applicants for appointment to the position of police officer will be questioned concerning the use, sale or possession of any illicit drug, including marijuana. The use, sale or possession of any illicit drug, including marijuana, within six months preceding the date of completion of the Personal Data Questionnaire will result in disqualification of an applicant from further consideration for the position of police officer at that time. However, disqualification of an applicant solely for marijuana use or possession of 30 grams or less of marijuana within six months of the date of completion of the Personal Data Questionnaire shall

not bar such applicant from subsequent consideration for appointment after six months from the date of the applicant's last use or possession of marijuana. Any such applicant, at his or her request, after the expiration of six months from the applicant's last use or possession of marijuana shall be reconsidered by the City for appointment as a police officer without the **\*365** necessity of reapplying to the police department, and, if thereafter appointed, shall be hired promptly and in the order of the applicant's position on the eligibility list. Prior to the completion of the Personal Data Questionnaire or equivalent document, each applicant shall be furnished with a written statement of the policies set forth in this paragraph and of the right of reconsideration hereunder.

(6). Investigation and supervisory staffing of the police department's Background Investigation Unit or equivalent body shall include a representative percentage of black police officers, which, in any event, shall not be less than thirty percent.

(b). The Review Panel established pursuant to Paragraph 2(d) of the 1973 Decree shall continue in effect to review, after proper notice, the cases of police applicants who have been rejected for employment as the result of background investigations conducted after April 10, 1973 and who have sought or hereafter seek such review. All motions relating to approximately fifty such cases which were presented to the Review Panel as the result of the Court's Memorandum and Order of November 19, 1976, shall be deemed withdrawn pending new hearings in these and the other cases. The Review Panel shall operate under the notice, hearing, and appeal procedures set forth in paragraphs 2(c), (d), and (e) of the 1973 Decree. With regard to the cases presented to the Review Panel:

(1). If the Review Panel determines that the applicant should have been hired when originally considered, under then applicable standards, and is presently qualified, then the Panel shall recommend that the applicant be hired on a priority basis with an appropriate competitive seniority date, at a salary consistent with that date. Notwithstanding the seniority date so awarded, the first six months of such applicant's employment as a police officer shall be considered the probationary period provided under Civil Service Regulations.

(2). For every applicant not covered by Paragraph 5(b)(1), if the Review Panel determines that, although the rejection for employment was not improper under then applicable

standards, the applicant is presently qualified and should be hired, then the Panel shall recommend that the applicant be hired on a priority basis without remedial seniority for any purpose. This paragraph shall not make ineligible for seniority in pay any applicant recommended by the Panel for hire who was previously rejected solely under § 8.0234 of the Civil Service Regulations.

(3). Any person hired pursuant to Paragraph 5(b)(1) or 5(b)(2) shall be hired in rank order, with hires from earlier eligibility lists having priority over those on later lists, in the next police officer training academy class; provided that in no event shall persons hired pursuant to 5(b)(2) exceed 25% of any police officer training class; and further provided that the rights created hereunder shall be subordinate to the rights of persons hired pursuant to *United States v. City of Philadelphia,* C.A. 74–400, *Brace v. O'Neill,* C.A. 74–339, *Sanford v. O'Neill,* C.A. 78–1154, and to persons hired pursuant to paragraph 6 of this Consent Order.

(4). Any candidate found eligible for appointment by the Review Panel or the Court under Paragraph 5(b)(1), and any candidate who, having withdrawn his appeal from a prior split vote decision of the Review Panel, is found to be presently qualified under Paragraph 5(b)(2), who has reached or exceeded 35 years of age shall not be disqualified from employment, if, at the time of the original rejection, the applicant was of a qualifying age.

(5). The Review Panel shall make every effort to complete the hearings of persons rejected on the background investigation from April 10, 1973 to the date of the entry of this Order within six months after the entry of this Order, and shall, at the conclusion thereof, issue a report of the results of these hearings to the Court and all counsel.

(6). It is expressly understood and agreed that no person eligible for relief under any provision of this Consent Order shall be entitled to either an award of back pay or an award of seniority credit for **\*366** purposes of computation of or eligibility for a pension pursuant to any City pension plan.

(c). So long as the City complies with this paragraph 5, the plaintiffs agree that they consent to and shall not challenge the legality or validity of any aspect of the current background investigation process and procedures.

## V. REMEDIAL HIRING OF QUALIFIED BLACK APPLICANTS

6. Subject to the availability of qualified black applicants on the then current police officer eligibility list, and in addition to those qualified black applicants who the City would otherwise hire (i) on a rank order basis as required by law, or (ii) pursuant to the October 1, 1980, Consent Decree in *United States v. City of Philadelphia,* C.A. 74–400, *Brace v. O'Neill,* C.A. 74–339, and *Sanford v. O'Neill,* C.A. 78–1154, or (iii) pursuant to Paragraph 5(b) of this Consent Order, the City shall hire an additional 293 qualified black applicants over the next 2442 hires. Such additional qualified black applicants shall be hired at a rate of 12 of each 100 hires, as nearly as possible, evenly apportioned in each class of new hires, and shall be chosen in their relative rank order from the then current police officer eligibility list. The position on the list of such additional qualified black applicants hired as a result of this paragraph shall be filled by the next highest ranking black remaining on the list. This procedure shall be implemented so that the number of blacks which the City would otherwise hire will not be reduced.

## VI. RECRUITMENT

7. The City shall use its best efforts to promote the interest, application, and hire of qualified black candidates for the position of police officer and shall continue to conduct a recruitment program to inform minority group members of the opportunities available within the police department and a training program designed to improve the testing skills of such applicants. Such efforts shall include the designation of a compliance officer to monitor compliance with this Consent Order and to assist minorities in the completion of all phases of the hiring process, including the background investigation stage. During the next recruitment period, the City shall conduct an affirmative action recruitment program comparable to the program conducted under the supervision of the Mayor's Compliance Group prior to the administration of the 1982 Civil Service examination for the position of police officer, including:

(a). Use of Personnel Department employees and police officers as full-time recruitment officers;

(b). Cooperation with the Guardian Civic League and other organizations in the recruitment and pre-examination training

of applicants for the written entrance examination for the position of police officer;

(c). Establishment of recruitment offices in various neighborhoods of Philadelphia;

(d). Visitation to area high schools and colleges with special emphasis on those schools with a substantial minority student body population;

(e). Follow-up on all applications submitted by minorities to encourage continuous interest in a career in law enforcement.

## VII. NOTICE AND REPORTING REQUIREMENTS

8(a). In addition to the requirements for notice and reporting set forth in the preceding paragraphs, the City shall report the following information to the Court and counsel for the parties on a semi-annual basis for three years following the entry of this Order:

(1). Current racial composition of the police department in each rank;

(2). Racial composition of each police academy class begun during the period;

(3). Results by race of entrance and all promotional, psychiatric and background examinations administered during the period;

 **\*367** (b). The notice sent to members of the plaintiff class eligible for a hearing before the Review Panel shall include a copy of this Order.

## VIII. DURATION OF ORDER

9. Except as set forth herein with respect to Paragraphs 2(c), 5, 6, and 7, the rights and obligations under this Consent Order

shall expire three years from the date of its entry by the Court, unless extended by the Court after a determination by the Court that the City has failed to substantially comply with the terms herein. The rights and obligations under Paragraph 2(c) shall expire upon the termination of the eligibility list for the position of police officer as specified in Paragraph 2(c). The rights and obligations under Paragraph 5 shall expire when the reviews sought by applicants on the current eligibility list have been completed. The rights and obligations under Paragraph 6 shall expire upon the hire of 293 additional qualified black applicants pursuant to that paragraph. The rights and obligations under Paragraph 7 shall expire after the next Civil Service examination for the position of police officer. Upon the expiration of this Order as set forth above, this litigation shall be terminated with prejudice.

## IX. RELEASE

10. For and in consideration of this Consent Order as set forth in the preceding paragraphs, the named plaintiffs and the classes they represent, including the class of all black applicants and prospective black applicants for employment in the Philadelphia Police Department and the class of all black police officers in the Philadelphia Police Department, the Commonwealth of Pennsylvania and the Guardian Civic League agree and consent to the entry of this Order as a final order with respect to all of the remaining issues in this litigation, and do hereby remise, release, and forever discharge the defendants, their agents, servants, or employees, from any and all liability, actions and causes of actions, claims, and demands whatsoever in law or equity which have arisen in this action or which could have arisen from this action, including but not limited to challenges as to the legality or validity of any aspect of the hiring or promotional process for positions in the police department administered prior to the date of this order.

**All Citations**

100 F.R.D. 354, 35 Fair Empl.Prac.Cas. (BNA) 1776

## Footnotes

1    There is, of course, strong reason to believe that the 1982 entrance examination would survive a litigated challenge; but there can be no certainty on that subject.

35 Fair Empl.Prac.Cas. (BNA) 1776

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

---