UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **Christopher Bloom**, **Andrew Furtak, Kollin Berg**, **Joseph Musumeci, Matthew Stankiewicz, Marc Monachello**, **Leroy Ziegler Jr.,** and **Robert Ritchie,**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Philadelphia**, **Kevin J. Bethel**, in his official capacity as Police Commissioner, **Krista Dahl-Campbell**, in her official capacity as Police Deputy Commissioner, and **Candi Jones**, in her official capacity as Chief Human Resources Officer,<br><br>Defendants. | Case No. 2:26-cv-01232-JDW |

### FIRST AMENDED CLASS-ACTION COMPLAINT

Plaintiffs Christopher Bloom, Andrew Furtak, Kollin Berg, Joseph Musumeci, Matthew Stankiewicz, Marc Monachello, Leroy Ziegler Jr., and Robert Ritchie serve as police officers in the Philadelphia Police Department. In May and November 2025, the plaintiffs were denied promotions because of their race and sex. The City of Philadelphia has adopted a Diversity, Equity, and Inclusion (DEI) promotion policy that it calls the "Rule of Five," which was instituted for the express purpose of increasing the representation of minority and female candidates in supervisory positions within the City of Philadelphia at the expense of white men. The plaintiffs bring suit to enjoin the continued enforcement of these unlawful and discriminatory DEI practices and obtain the promotions that the city wrongfully withheld from them.

## PARTIES, JURISDICTION, AND VENUE

1.  Plaintiff Lieutenant Christopher Bloom is a citizen of the United States and a resident and citizen of Pennsylvania. Lieutenant Bloom was at all relevant times an employee of the Philadelphia Police Department.

2.  Plaintiff Lieutenant Andrew Furtak is a citizen of the United States and a resident and citizen of Pennsylvania. Lieutenant Furtak was at all relevant times an employee of the Philadelphia Police Department.

3.  Plaintiff Lieutenant Kollin Berg is a citizen of the United States and a resident and citizen of Pennsylvania. Lieutenant Berg was at all relevant times an employee of the Philadelphia Police Department.

4.  Plaintiff Lieutenant Joseph Musumeci is a citizen of the United States and a resident and citizen of Pennsylvania. Lieutenant Musumeci was at all relevant times an employee of the Philadelphia Police Department.

5.  Plaintiff Sergeant Matthew Stankiewicz is a citizen of the United States and a resident and citizen of Pennsylvania. Sergeant Stankiewicz was at all relevant times an employee of the Philadelphia Police Department.

6.  Plaintiff Sergeant Marc Monachello is a citizen of the United States and a resident and citizen of Pennsylvania. Sergeant Monachello was at all relevant times an employee of the Philadelphia Police Department.

7.  Plaintiff Sergeant LeRoy Ziegler Jr. is a citizen of the United States and a resident and citizen of Pennsylvania. Sergeant Ziegler was at all relevant times an employee of the Philadelphia Police Department.

8.  Plaintiff Inspector Robert Ritchie is a citizen of the United States and a resident and citizen of Pennsylvania. Inspector Ritchie was at all relevant times an employee of the Philadelphia Police Department.

9.  Defendant Philadelphia Police Department is a department of the City of Philadelphia. Its headquarters are located at 400 North Broad Street, Philadelphia,

Pennsylvania 19130. Defendant Philadelphia Police Department was at all relevant times the plaintiffs' employer or an agent of the City of Philadelphia within the meaning of Title VII (42 U.S.C. § 2000e(b)) and the Pennsylvania Human Relations Act.

10.  Defendant Police Commissioner Kevin J. Bethel is the Commissioner of the Philadelphia Police Department. At all relevant times, defendant Bethel was an employee of the Philadelphia Police Department with final authority over promotional decisions. Defendant Bethel is sued in his official capacity.

11.  Defendant Police Deputy Commissioner Krista Dahl-Campbell is the Deputy Commissioner of Organizational Services for the Philadelphia Police Department. At all relevant times, defendant Dahl-Campbell was an employee of the Philadelphia Police Department, and was responsible for implementing promotional decisions and notifying candidates of selection or non-selection. Defendant Dahl-Campbell is sued in her official capacity.

12.  Defendant Director of Human Resources Candi Jones is the Director of Human Resources for the City of Philadelphia. At all relevant times, defendant Jones was an employee of the City of Philadelphia responsible for administering the civil-service examination and eligibility-list system, as well as implementing the "Rule of Five" policy citywide. Defendant Jones is sued in her official capacity.

13.  This Court has subject-matter jurisdiction over the claims arising under federal civil-rights statutes such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. *See* 28 U.S.C. § 1331; 28 U.S.C. § 1343.

14.  This Court has supplemental jurisdiction over the claims arising under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 et seq., because those claims arise from the same nucleus of operative facts as the plaintiffs' federal-law claims. *See* 28 U.S.C. § 1367(a); *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966).

15. Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in this district, and the unlawful employment practice is alleged to have been committed in this district. *See* 28 U.S.C. § 1391(b)(2); 42 U.S.C. § 2000e-5(f)(3). Venue is additionally proper because one or more of the defendants reside in this district and all of the defendants reside in Pennsylvania. *See* 28 U.S.C. § 1391(b)(1).

16. Plaintiffs Bloom, Berg, Musumeci, Monachello, and Ziegler have exhausted their administrative remedies by filing charges of discrimination with the Equal Employment Opportunity Commission in late November 2025. Each of those plaintiffs received a right-to-sue letter from the United States Department of Justice, Civil Rights Division, Employment Litigation Section, on January 22, 2026. *See* Exhibits 1–5.

17. Plaintiffs Furtak and Stankiewicz have exhausted their administrative remedies by filing charges of discrimination with the Equal Employment Opportunity Commission on March 27, 2026. Each of those plaintiffs received a right-to-sue letter from the United States Department of Justice, Civil Rights Division, Employment Litigation Section. *See* Exhibits 6–7.

18. Plaintiff Furtak received a right-to-sue letter from the United States Department of Justice, Civil Rights Division, Employment Litigation Section, on April 13, 2026. *See* Exhibit 6.

19. Plaintiff Stankiewicz received a right-to-sue letter from the United States Department of Justice, Civil Rights Division, Employment Litigation Section, on May 19, 2026. *See* Exhibit 7.

20. Plaintiff Ritchie has exhausted his administrative remedies by filing a charge of discrimination with the Equal Employment Opportunity Commission on March 28, 2026. He received a right-to-sue letter from the United States Department of Justice, Civil Rights Division, Employment Litigation Section. *See* Exhibits 8.

21.  Plaintiff Ritchie received a right-to-sue letter from the United States Department of Justice, Civil Rights Division, Employment Litigation Section, on May 19, 2026. *See* Exhibit 8.

22.  The initial complaint was timely filed within 90 days of the date on which the original plaintiffs (Bloom, Berg, Musumeci, Monachello, and Ziegler) received their right-to-sue letters.

23.  This amended complaint was timely filed within 90 days of the date on which the added plaintiffs (Furtak, Stankiewicz, and Ritchie) received their right-to-sue letters.

## STATEMENT OF FACTS

24.  Before the city of Philadelphia adopted its illegal and discriminatory "Rule of Five" promotional policy in 2021, it had been using a merit-based promotional policy that it called the "Rule of Two," which required the appointing authority to select from among the top two candidates on the civil-service eligibility list for each promotional vacancy. The city of Philadelphia had employed the "Rule of Two" for decades before adopting the "Rule of Five" in 2021.

25.  In May 2021, then-Councilmember Cherelle L. Parker (now Mayor of Philadelphia) introduced legislation to eliminate the "Rule of Two" and replace it with a "Varying Rule" (commonly called the "Rule of Five") that would give appointing authorities discretion to select from a larger pool of candidates for each promotional vacancy.

26.  When introducing this legislation, then-Councilmember Parker declared: "It is one thing for an employer to say, 'Black Lives Matter,' and an entirely different thing for an employer to make real, substantive changes that ensure diversity, equity, and inclusion." *See* City Council of Philadelphia, *Council Adopts Parker Legislation to*

*Increase Diversity in City Hiring by Eliminating 'Rule of Two'* (June 18, 2021), available at http://bit.ly/4qUiBNf [https://perma.cc/CHG7-VWR2] (attached as Exhibit 9).

27.  Then-Councilmember Parker further stated: "Our municipal government is one of the largest employers in the City of Philadelphia, and for too long, the Rule of Two has held back Black and Brown employees, either from obtaining that entry-level job or from getting that promotion." *Id.*

28.  On June 17, 2021, the Philadelphia City Council unanimously adopted legislation eliminating the Rule of Two. *See id.*

29.  The legislation was then placed on the November 2021 ballot as a ballot question for Philadelphia voters.

30.  In November 2021, Philadelphia voters approved an amendment to the city's home-rule charter that eliminates the "Rule of Two" and authorizes the Human Resources Director to set a varying rule for each promotional announcement.

31.  On March 10, 2022, the City Council adopted Resolution No. 220193, introduced by then-Councilmember and now-Mayor Cherelle L. Parker, calling on then-Mayor James F. Kenney and his administration to "conduct an annual review of how the City's elimination of the 'Rule of Two' has impacted workforce diversity in both hiring and promotion." Resolution No. 220193 (attached as Exhibit 10); *see also* http://bit.ly/3Oshuah [https://perma.cc/84XG-25Y3].

32.  Resolution No. 220193 repeatedly bemoans the fact that white men were obtaining too many promotions under the city's merit-based promotion system, and that "Rule of Two" had been hindering the city's efforts to award discriminatory preferences to less qualified female and minority job applicants. *See id.* And Resolution No. 220193 explicitly declares that the city's purpose and objective in eliminating the "Rule of Two" was to reduce the number of white men in the city's workforce and to

reduce the number of white men who obtain promotions, so that the racial and gender makeup of the city's workforce will become "more reflective of Philadelphia's demographics." *Id*. Resolution No. 220193 states, in relevant part:

> WHEREAS, Before its elimination, many had argued for decades that the Rule of Two discriminated against minorities and women for entry-level hiring, but especially with regard to promotions; and

> WHEREAS, A 2018 Report by the Pew Charitable Trust—Hiring and Employment in Philadelphia Government—revealed that the Rule of Two . . . could undermine a manager's ability to hire a diverse workforce; and

> WHEREAS, By eliminating the Rule of Two, the goal is to increase the diversity of candidate pools . . .

> WHEREAS, Eliminating the Rule of Two will allow the Human Resources Director for the City to set rules for each announcement based on several variables defined under specific guidelines which will address these questions and more: 1) What is the diversity of the incumbents in the job title to be announced?, 2) Where are the gaps in diversity?, 3) What is the historical data from prior lists about diversity of the talent pool?, and 4) What is the data on budgeted vacancies?, 5) What is the projected size of the candidate pool and the availability of qualified candidates?, and 6) What is the ability to use more flexible selection tools?; and

> WHEREAS, A 2015 article by Tom Ferrick in The Philadelphia Inquirer detailed how our local government workforce did not reflect the City of today. He wrote, "Blacks, Latinos, and Asians are underrepresented when it comes to local government jobs. Women of all races and ethnic origins are as well." His analysis found that for the 4,000-plus City employees who earned $70,000 a year or more, 64 percent were white and 72 percent were male. And for the 4,000 or so City employees who earned $35,000 a year or less, 67 percent were Black and 55 percent were male. He also found that the average salary of a white worker ($60,107) was about $10,642 more than the average for a Black employee, who earned $49,465; and

> WHEREAS, Ferrick's article pointed out the obvious that when it comes to promotions, because the pipeline usually is filled with white

males in many departments, the odds favor them taking the next step up; and

WHEREAS, Our municipal government is one of the largest employers in the City of Philadelphia, and for too long, the Rule of Two has held back Black and Brown employees, either from obtaining an entry-level job or from getting that promotion. Eliminating the Rule of Two is by no means a "silver bullet" to making our City's workforce, and particularly our City's upper management, more reflective of Philadelphia's demographics, but it is a necessary and important step; and

WHEREAS, To ensure that the elimination of the Rule of Two has its intended effect to increase diversity and to provide greater flexibility in the hiring process, the Mayor and his administration must conduct an annual review of how the City's elimination of the Rule of Two has impacted workforce diversity in both hiring and promotion and has provided hiring managers greater flexibility in these employment decisions. The annual review should occur for at least the next three years to ensure that we are on the right path; now, therefore, be it

RESOLVED, BY THE COUNCIL OF THE CITY OF PHILADELPHIA, That it hereby calls on Mayor James F. Kenney and his administration to conduct an annual review of how the City's elimination of the Rule of Two has impacted workforce diversity in both hiring and promotion.

Resolution No. 220193 (attached as Exhibit 10); *see also* http://bit.ly/3Oshuah [https://perma.cc/84XG-25Y3].

33. Resolution No. 220193 is but one of the many examples of the city of Philadelphia's determination to impose illegal DEI practices that consciously and intentionally discriminate against white men.

34. On January 4, 2016, for example, Mayor James F. Kenney issued Executive Order No. 1-16, which declares that "an effective diversity management policy for the City requires coordinated implementation of diversity and inclusion programs, initiatives, research and strategies related to all aspects of City work, including employment, promotions, procurement and communications." Executive Order No. 1-

16 (attached as Exhibit 11); *see also* http://bit.ly/4kTv4Q7 [https://perma.cc/WQ52-R82C].

35. Executive Order No. 1-16 also established the position of "Chief Diversity & Inclusion Officer," whose duty is to "promote diverse and inclusive best practices throughout City government." *Id*. at § 1.

36. Executive Order No. 1-16 directs the Chief Diversity & Inclusion Officer to "provide direction, guidance, advice, and support to the Mayor, as well as City departments, agencies, authorities, boards and commissions, on improving and strengthening diversity and inclusion throughout City government," as well as "[a]ssist City departments, agencies, authorities, boards and commissions in identifying, developing and implementing inclusive strategies and initiatives to improve the recruitment, retention and promotion of diverse persons." *Id*. at § 2.

37. In January 2020, Mayor Kenney issued Executive Order No. 1-20, which boasts that "during the past four years this government has made steady advances in building a more diverse workforce" and announces that "a pillar of this Administration has been to develop a diverse workforce that looks like Philadelphia." Executive Order 1-20 (attached as Exhibit 12); *see also* http://bit.ly/4aGNQ8x [https://perma.cc/75UL-3J69].

38. Executive Order No. 1-20 also announces a new "Employment Diversity and Inclusion Initiative," and it declares that "[t]he purpose of the Employment Diversity and Inclusion Initiative is to promote the City's commitment to building a workforce that better reflects and serves the people of Philadelphia, inclusive of race, ethnicity, religion, ability, age, gender, gender identity and sexual orientation." *Id*. at § 2(A).

39. Executive Order No. 1-20 requires all city departments and officers to "each year prepare an Employment Diversity and Inclusion Plan," and it requires the Chief Diversity, Equity, and Inclusion Officer or its designee to "regularly meet with each department to review progress in achieving benchmarks within their Annual EDI

Plan." *Id*. at §§ 2(B) and 2(D). The order also requires DEI to "work with each department to develop a departmental Racial Equity Action Plan, which will identify goals to increase success for all groups through targeted strategies focused on the elimination or altering of government policies, practices, attitudes and cultural messages that influence differential outcomes by race." *Id*. at § 2(C).

40. In November 2022, the Mayor's Office of Diversity, Equity, & Inclusion issued its "FY22 Racial Equity Cohort Departmental Racial Equity Action Frameworks." *See* Exhibit 13; *see also* http://bit.ly/4awniIm [https://perma.cc/QC26-QML4]. This document lists the Philadelphia Police Department as one of the "Participating City Departments in FY22 Racial Equity Cohort." *Id*. at 5. It denounces the city's previous merit-based hiring and promotional "rules" as one of the "root causes of disparate outcomes." *Id*. at 3, 24–25. And the phrase "disparate outcomes" refers to any city workforce that fails to produce an equal or greater percentage of individuals who are "black, indigenous, or people of color" (BIPOC) than those that exist in the city's overall population—regardless of whether the employment practices that produce these outcomes are motivated by a racially discriminatory purpose.

41. In explaining how the city's previous merit-based hiring and promotional "rules" such as the "Rule of Two" became a "root cause" of disparate outcomes, the city's FY22 Racial Equity Cohort Departmental Racial Equity Action Frameworks states:

> Certain rules dictate job descriptions and qualification requirements, which limits job access in the City for BIPOC. OHR can own this work for Civil Service positions, but partnerships with other departments is required to address 900+ job titles.

*Id*. at 25. It also announces that its "strategy" to deal with this "root cause" is to "Develop Civil Service Hiring & Promotions Racial Equity Strategy," which "involves developing a plan to identify, assess, and change Civil Service job descriptions that

result[] in racial inequities." *Id.* at 24–25. And it declared that each of the following "performance measures" will be used to assess the efficacy of this strategy:

- %/# increase in diverse hires and promotions in racially inequitable City Service positions

- %/# increase of BIPOC candidates eligible for hiring and promotions

*Id.* at 24.

42. On October 23, 2023, Mayor Kenney issued Executive Order No. 6-23, which declares, among other things, that "deep race-based disparities exist in Philadelphia," that "these racial inequities are the result of individual, institutional and structural racism that continues to disadvantage Black, Indigenous, and People-of-Color communities," and that "the City of Philadelphia seeks to strengthen a successful framework for ensuring diversity, equity, inclusion, and access in all aspects of government decision-making." Executive Order No. 6-23 at 1 (attached as Exhibit 14); see also http://bit.ly/4aDc9nK [https://perma.cc/7N6T-QPMB]. The executive order boasts that "the City of Philadelphia has established strategies and initiatives designed to address racial inequities in its hiring, promotional and other people strategies," while simultaneously insisting that "additional and ongoing efforts are needed to fully leverage the City's existing processes and strategies and to address racial inequities in City policies, practices, systems, and structures." *Id.* at 1.

43. Executive Order No. 6-23 also announces that "[t]he leaders of all City departments and offices under the authority of the Mayor hereby commit to managing ongoing and sustained efforts to pursue racial equity in decision-making, operations, and service delivery." *Id.* at § 1. It requires each city department (including the police department) to "annually prepare a Racial Equity Action Plan . . . as part of the Annual Employment Diversity and Inclusion Plan process. Each departmental Annual Racial Equity Action Plan shall identify recommendations and next steps to promote

racial equity through internal and external strategies during the upcoming year." *Id.* at § 2(A). It also requires each city department to make "an annual assessment of the extent to which its current and proposed resource allocations will drive outcomes that reduce racial disparities within the City." *Id.* at § 2(B).

44.  The city of Philadelphia's DEI Template Plan, issued by the Office of Diversity, Equity and Inclusion, declares that one of its purposes is for "departments to document and improve their efforts to recruit, hire, train, retain and promote a diverse, equitable and inclusive workforce." Office of Diversity, Equity and Inclusion, *City of Philadelphia Diversity, Equity & Inclusion Plan Template* at 4 (attached as Exhibit 15); *see also* http://bit.ly/4rIaa99 [https://perma.cc/J7X3-X9UQ]. It also calls on the city's departments to "document and improve their efforts to allocate existing resources to reducing or eliminating systemic inequity." *Id.*

45.  The DEI Template Plan declares that one of its objectives is to "[b]uild and retain a workforce that better reflects and serves the residents of [P]hiladelphia." *Id.* at 7. Another objective is to "[i]mprove the promotion of diverse employees." *Id.* at 9. And yet another objective is to "adopt a departmental policy and practice infrastructure that centers and accelerates sustained redress of racial disparities internally." *Id.* at 15. The DEI Template Plan describes the "key strategies" to achieve this "goal" as:

- Assess and identify internal racial disparities on an annual basis and as needed.

- Identify where departmental policies, practices, attitudes and cultural messages are resulting in differential outcomes by race on an annual basis and as needed.

*Id.* at 15. And it describes the "Metrics and Performance Indicators" as: "Reduction and/or elimination of disparities and differential outcomes by race." *Id.*

46. The Philadelphia Police Department's FY 2023 DEI Plan declares that one of the citywide DEI objectives is to "[a]dopt a departmental policy and practice infrastructure that centers and accelerates diversity, equity, and inclusion." PPD's FY 2023 DEI Plan at 3 (attached as Exhibit 16); *see also* http://bit.ly/4kOK1Tn [https://perma.cc/M83L-HCAT]. As part of its "key strategies" to implement this citywide objective, the Philadelphia Police Department's DEI Plan announces that it will "[i]ntegrate DEI principles into all decision-making processes." *Id*. Later in the document, the Philadelphia Police Department observes that another citywide DEI objective is to "[i]mprove the promotion of diverse employees." *Id*. at 9. It also notes that one of the "metrics and performance indicators" demanded by the Mayor's Office of Diversity, Equity, and Inclusion is the "[r]eduction and/or elimination of disparities and differential outcomes by race." *Id*. at 20.

47. The Philadelphia Police Department's DEI Plan for FY 2023 notes that it "hired its first Chief DEI Officer in April 2022," but insists that "additional creative strategies are necessary to address diverse hiring, promotion, and retention challenges." *Id*. at 7. It also declares that "the Department is working to identify key performance indicators and metrics to accurately assess and evaluate its progress toward diversity goals." *Id*. And it boasts that Philadelphia Police Department "is a signatory to the 30x30 Initiative," whose "goal" is to "implement effective strategies, practices, and policies to increase the representation of women in policing to 30% by the year 2030." *Id*. at 8.

48. The Philadelphia Police Department's website also proclaims that it has "formally committed" to "increase the representation of women in policing to 30% by the year 2030." *See* Philadelphia Police Department, *Becoming an Officer: Diversity & Inclusion* (attached as Exhibit 17); *see also* http://bit.ly/4rycqzH [https://perma.cc/K2LS-W84X]. On its "Diversity & Inclusion" page, the department says:

> As part of our continued efforts to build a stronger, more inclusive, and modern police department, we are proud to announce that our agency has formally committed to the 30×30 Pledge.
>
> The 30×30 Initiative is a national effort with a clear goal: to increase the representation of women in policing to 30% by the year 2030, and to ensure a culture where women officers can thrive. Currently, women make up just 12% of sworn officers nationwide and our department is currently staffed at 22% women. These numbers have remained stagnant for years, and it's time to change that.

*Id*.

49. A draft of the Philadelphia Police Department's Five-Year Strategic Plan (2026) states that one of its objectives is to "[e]xpand recruitment efforts to advance a diverse workforce that reflects the community we serve." PPD's Draft Five-Year Strategic Plan at 19 (2026) (attached as Exhibit 18); *see also* bit.ly/4s64OV1 [https://perma.cc/7ESX-RQDT]. It also declares that "a workforce that mirrors the community can improve communication, build trust, and reduce perceptions of bias." *Id*. And it mentions the "percent of sworn and professional workforce demographics (race, ethnicity, gender) that align with Philadelphia's population demographics" as one of its "key performance indicators." *Id*. at 20.

50. These documents show what the city of Philadelphia and its leaders are determined to make the racial and demographic makeup of its police department "mirror" and "align with" the city's population as a whole—regardless of individual merit or job performance. As a result of these DEI edicts, the city of Philadelphia has consciously, intentionally, and purposefully discriminated against white men in an effort to bring about the desired racial and gender makeup of its workforce, and it will continue these illegal and discriminatory hiring and promotion practices until it is enjoined from doing so.

## THE PROMOTIONS

51. In November 2025, the Philadelphia Police Department promoted 10 individuals from lieutenant to captain and promoted 14 individuals from sergeant to lieutenant. Seven of the plaintiffs sought and were passed over for one of these promotions on account of their race and sex under the "Rule of Five." Four of the plaintiffs (Bloom, Furtak, Berg, and Musumeci) sought promotions from lieutenant to captain. Three of the plaintiffs (Stankiewicz, Monachello, and Ziegler) sought promotions from sergeant to lieutenant.

52. In May and November 2025, the Philadelphia Police Department passed over plaintiff Ritchie for promotion from Inspector to Chief Inspector on account of his race and sex under the "Rule of Five."

## I.    The Promotions From Lieutenant To Captain

53. Plaintiffs Bloom, Furtak, Berg, and Musumeci were each seeking one of the 10 available promotions from lieutenant to captain.

54. The Police Department produces a "captain eligibility list," which ranks candidates for promotion based on their civil-service examination scores. Plaintiff Christopher Bloom was ranked eighth on this list with a test score of 90.83. Plaintiff Andrew Furtak was ranked ninth with a test score of 90.68. Plaintiff Kollin Berg was ranked eleventh with a test score of 90.28. And plaintiff Joseph Musumeci was ranked 13th with a test score of 90.01.

55. In October 2025, the Philadelphia Police Department conducted promotional interviews for the rank of captain, interviewing the top 23 candidates from the eligibility list for the 10 available Captain positions.

56. Under the "Rule of Two" that had previously governed promotions in the Philadelphia Police Department, the city would have been required to select from between the two highest-ranking officers for each open slot.

57. But under the "Rule of Five" that the city had adopted for the purpose of limiting the number of white men receiving promotions, the city is given more discretion and latitude to promote lower-ranked officers over those with higher rankings and better scores on the civil-service examination, and the city used this latitude and discretion to award promotions to lower-ranked female and minority officers at the expense of higher-ranked white men.

58. On November 3, 2025, Deputy Commissioner Dahl-Campbell sent an e-mail to the passed-over candidates (including plaintiffs Bloom, Furtak, Berg, and Musumeci) informing them that they were "not selected for promotion" under the "Rule of 5 (the city of Philadelphia's Varying rule), but that they would "remain on the list" and be "eligible for future consideration."

59. The e-mail that plaintiffs Bloom, Furtak, Berg, and Musumeci received from defendant Dahl-Campbell provided no explanation or justification for why they had been passed over for promotion, apart from invoking the "Rule of Five."

60. Of the 23 candidates that the Philadelphia Police Department interviewed for promotion to captain, six were passed over for promotion in favor of individuals with lower scores on their civil-service examination.

61. Five of the six passed-over individuals were white males and the remaining passed-over individual was a black male.

62. All three female candidates who interviewed for a promotion to captain received their promotion, and no female candidates for promotion were passed over in favor of individuals with lower scores on their civil-service examination.

63. Of the 10 individuals promoted to captain, only 50% were white males even though white men constituted 70% of the top ten candidates and 73% of the top 15 candidates by test scores.

64.  The defendants reached all the way down to 14th and 17th on the captain eligibility list to promote black male candidates Matthew Johnson and Brian Sprowal,[1] while bypassing the white male candidates ranked 8th (Bloom), 9th (Furtak), 11th (Berg), and 13th (Musumeci)—all of whom had higher civil-service examination scores than Johnson and Sprowal.

65.  The defendants chose to promote Johnson and Sprowal over plaintiffs Bloom, Furtak, Berg, and Musumeci because Johnson and Sprowal are black and the plaintiffs are white. If the races of these individuals had been reversed, then the defendants would have promoted Bloom, Furtak, Berg, and Musumeci to captain.

## II.   The Promotions From Sergeant To Lieutenant

66.  Plaintiffs Stankiewicz, Monachello, and Ziegler were each seeking one of the 14 available promotions from sergeant to lieutenant.

67.  The Police Department produces a "lieutenant eligibility list," which ranks candidates for promotion based on their civil-service examination scores. Plaintiff Matthew Stankiewicz was ranked 2nd on this list with a test score of 93.7772. Plaintiff Marc Monachello was ranked 27th on this list with a test score of 85.9574. Plaintiff LeRoy Ziegler Jr. was ranked 28th with a test score of 85.8926. Fifteen individuals on this list had already been promoted from sergeant to lieutenant during a previous promotion cycle in April 2025, so Stankiewicz, Monachello, and Ziegler were among the 14 highest-ranked remaining candidates on the lieutenant eligibility list.

68.  But Stankiewicz, Monachello, and Ziegler were passed over for promotion in favor of lower-ranked female or minority candidates with lower scores on the civil-service examination, including Tamika Reid (black female, ranked 30th with test score

---

1.  Lieutenant David Potter was originally ranked 19th on the captain-eligibility list but later had education points added, so he jumped from 19th to 15th. This moved Brian Sprowal (black male) down from 16th to 17th and pushed Vitaliy St. Onge (white male) down from 15th to 16th.

of 85.8404), Kathleen Momme (white female, ranked 34th with test score of 85.3750). and Antonio Bennett (black male, ranked 35th with test score of 85.0888).

69.  The defendants chose to promote Reid, Momme, and Bennett over plaintiffs Stankiewicz, Monachello, and Ziegler because Reid, Momme, and Bennett are female or black and the plaintiffs are white men. If the demographic characteristics of these individuals had been reversed, then the defendants would have promoted Stankiewicz, Monachello, and Ziegler to lieutenant.

## III.    The Promotion From Inspector to Chief Inspector

70.  Plaintiff Robert Ritchie was seeking promotion to Chief Inspector, the highest-ranking civil-service position below the appointed positions such as Police Commissioner.

71.  The civil-service examination for the Chief Inspector position is scored out of 100 points, with additional points awarded for educational credentials: 0.5 points for an associate's degree, 1.0 point for a bachelor's degree, and 1.5 points for a master's degree.

72.  Inspector Ritchie holds a Ph.D. and received a perfect score on the Chief Inspector promotional examination, achieving a total score of 101.5 points.

73.  Inspector Ritchie was tied with four other candidates who also received scores of 101.5 points on the examination. These five candidates were the top-ranked individuals on a list of nine total candidates. Because all five candidates were tied, they were assigned a ranking from 1 to 5 based on the order in which they applied. Inspector Ritchie's assigned ranking was 3.

74.  The City of Philadelphia's past practice when candidates were tied was to promote all tied candidates to Chief Inspector. But in Inspector Ritchie's case, the defendants departed from this practice. In the event that not all tied candidates could

be promoted, tiebreakers were to be determined based on city residency, seniority, and whether the candidate was a legacy of the Philadelphia Police Department.

75. Inspector Ritchie's grandfather was shot and killed in the line of duty while serving the Philadelphia Police Department in 1935, making Inspector Ritchie a legacy of the Department.

76. Inspector Ritchie has over 30 years and 4 months of law-enforcement experience, having begun his career on January 22, 1996, at the age of 19.

77. The candidates ranked fourth and fifth on the list would have lost under the tiebreaker criteria because they did not have city residency.

78. The candidates ranked first and second on the list had less time in service with the Philadelphia Police Department than Inspector Ritchie.

79. Inspector Ritchie's legacy status and seniority should have given him priority under the tiebreaker criteria.

80. Instead of promoting all tied candidates or applying the tiebreaker criteria, the defendants in May 2025 promoted the second-ranked candidate, a black male, bypassing both Inspector Ritchie and the first-ranked candidate.

81. During a subsequent round of promotions in November 2025, Inspector Ritchie was again passed over, this time in favor of the first-ranked candidate, a white male.

82. The defendants chose to bypass Inspector Ritchie for promotion despite his examination score of 101.5, advanced academic credentials including a Ph.D., his legacy status with the Philadelphia Police Department, and the city's past practice of promoting all tied candidates.

83. The defendants' stated reason for bypassing Inspector Ritchie for promotion was the application of the "Rule of Five." In reality, however, Inspector Ritchie was passed over for promotion because of his race. If Inspector Ritchie had been black

and the second-ranked candidate had been white, Inspector Ritchie would have been promoted to Chief Inspector.

## IV.    Response of the Fraternal Order of Police

84.  After the November 2025 promotions were announced, the Fraternal Order of Police Lodge #5 issued a statement denouncing the Philadelphia Police Department's use of the "Rule of Five." *See* FOP Statement on Recent Promotional Decisions (attached as Exhibit 19). The statement says:

> FOP Lodge #5 has spoken with numerousmembers who were passed over for promotion to the ranks of Sergeant, Lieutenant, and Captain under the "Rule of Five."

> Last year, PPD leadership assured the FOP that there would be no widespread use of the "Rule of Five." The events of yesterday clearly show otherwise.

> The FOP has filed grievances on behalf of all impacted members and is actively exploring additional remedies, including potential relief under recent guidance provided by the Federal Department of Justice and Equal Employment and Opportunity Commission concerning unfair DEl practices in law enforcement.

> We recognize the hard work, dedication, and commitment our members invest in the promotional process. They deserve far better from the PPD Executive Team than a cold, impersonal email dismissing their career aspirations without any credible explanation.

> Frankly, we need more support for our officers at a critical time when morale is low and retention of our officers is vital to the department's long-term growth and success.

> Any member affected by this matter is encouraged to contact the FOP at 215-629-3600 with questions or concerns.

*Id.* The statement is signed by Roosevelt L. Poplar, the president of FOP Lodge #5.

85.  The Fraternal Order of Police Lodge #5 also sent a letter to the United States Department of Justice requesting that it review and investigate the city of Philadelphia's promotional practices within the Philadelphia Police Department and the Philadelphia Sheriff's Department. *See* Exhibit 20. The letter states, in relevant part:

> Our Lodge has received an increasing number of complaints from members who believe they have been unlawfully passed over for promotion under the City's current promotional practices which allows the appointing authority to select any candidate on an eligible list, regardless of rank order, thereby enabling discretionary decisions that appear inconsistent with merit-based advancement.

> A significant number of these complaints have come from officers who allege that they have been bypassed for promotion in favor of less qualified candidates based on race, gender, or other protected characteristics. Many of these officers believe that the City and its departments are improperly incorporating diversity, equity, and inclusion (DEI) considerations into promotion decisions, a practice that, if true, would directly conflict with federal nondiscrimination laws, including Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause, as well as the Trump Administration's April 28, 2025 Executive Order concerning law enforcement ("Strengthening And Unleashing America's Law Enforcement To Pursue Criminals And Protect Innocent Citizens").

> The Fraternal Order of Police fully supports fair and equal opportunity for all officers. However, promotional decisions must be based on merit, qualifications, and objective standards, not on demographic or political considerations. When discretionary systems such as the City's current process are used to achieve unspoken diversity outcomes, they undermine both the integrity of the promotional process and the confidence of the officers who serve this city. Accordingly, we respectfully request that the Department of Justice's Civil Rights Division:

> 1. Conduct an independent review of the City of Philadelphia's law enforcement promotion policies and practices:

> 2. Determine whether DEl or other non-merit-based criteria are influencing promotion outcomes in violation of federal law; and

3. Ensure that all promotional candidates are evaluated and advanced solely based on job-related qualifications and lawful standards.

*Id.*

## V.    The Candidates Who Were Bypassed For Promotion To Captain

### A.    Plaintiff Christopher Bloom

86.  Plaintiff Christopher Bloom served as a lieutenant in the Philadelphia Police Department when the alleged discrimination occurred.

87.  Lieutenant Bloom was passed over for promotion to captain during the November 2025 promotion period.

88.  Lieutenant Bloom is a white male.

89.  Lieutenant Bloom was ranked eighth by test scores on the captain eligibility list with a score of 90.83.

90.  Lieutenant Bloom is aware of no pending internal affairs investigations that would justify a decision passing him over for promotion.

91.  Lieutenant Bloom's work experience includes four patrol districts along with internal affairs investigations.

92.  Lieutenant Bloom created several crime-fighting and community engagement initiatives on his own while serving as a lieutenant.

93.  Lieutenant Bloom holds a Doctor of Business Administration (2023) with the cognate of Leadership; graduating with "High Distinction" from Liberty University.

94.  Lieutenant Bloom's doctoral research project focused on employee burnout and retention in the Philadelphia Police Department.

95.  Lieutenant Bloom also holds a Masters of Business Administration (2018) with a focus in Human Resources.

96. Lieutenant Bloom authored the *Juvenile and Parents Resource Guide* (the 2024 and 2025 editions were written and available at the time he was passed over for promotion).

97. The *Juvenile and Parents Resource Guide* is an all-resources booklet for mass distribution throughout the community, including, but not limited to, homeless services, after-school programs, and shelters.

98. Lieutenant Bloom's *Juvenile and Parents Resource Guide* was posted on the Pennsylvania Democratic House of Representatives website. *See* https://perma.cc/AY3C-DPN4.

99. Lieutenant Bloom has received positive performance evaluations throughout his career.

### B.   Plaintiff Andrew Furtak

100. Plaintiff Andrew Furtak serves as a lieutenant in the Philadelphia Police Department.

101. Lieutenant Furtak is a white male.

102. Lieutenant Furtak was ranked ninth by test scores on the captain eligibility list with a score of 90.68.

103. Lieutenant Furtak has 18 years of service with the Philadelphia Police Department, including three years as a lieutenant.

104. Lieutenant Furtak's annual performance reviews have always been satisfactory.

105. Lieutenant Furtak has no disciplinary actions and no pending investigations by internal affairs.

106. Lieutenant Furtak regularly fills in for the captain in his assignment. As the administrative lieutenant in the 35th District, his captain relies on him for his institu-

tional knowledge and operational expertise. Lieutenant Furtak also presents at Comp-Stat meetings, where he is responsible for presenting operational analysis and explaining the underlying reasons for crime trends to the Commissioner and the executive team.

107. Lieutenant Furtak was passed over for promotion in favor of lower-scoring candidates, including two black men who ranked 14th and 17th on the captain eligibility list.

### C.    Plaintiff Kollin Berg

108. Plaintiff Kollin Berg is a lieutenant with the Philadelphia Police Department.

109. Lieutenant Berg is a white male.

110. Lieutenant Berg was ranked 11th by test scores on the captain eligibility list with a score of 90.28.

111. Lieutenant Berg's disciplinary record is free of pending actions, and he has not been subject to any disciplinary issues in the past seven years.

112. All of Lieutenant Berg's yearly evaluations are positive and highly commendable.

113. Three individuals with lower test scores were promoted over Lieutenant Berg, including two who had less time in service.

114. Two of those three individuals who were promoted over Lieutenant despite having lower test scores were black.

115. Lieutenant Berg has more than two decades of combined military and law-enforcement leadership experience.

116. Lieutenant Berg enlisted in the United States Army in July 1998 as an 11B Infantryman, completing basic training at Fort Benning, Georgia.

117. Lieutenant Berg was assigned to the 10th Mountain Division, 2nd Battalion, 22nd Infantry Regiment at Fort Drum, New York, where he served his entire eight-year military career.

118. Lieutenant Berg rose through the ranks from Private (E-1) to Sergeant First Class (E-7), holding numerous supervisory and leadership roles.

119. Lieutenant Berg completed rigorous military courses including Air Assault, Airborne, Expert Infantry Badge, Light Fighters School, the Primary Leadership Development Course, and the Basic Noncommissioned Officer Course.

120. During Lieutenant Berg's military service, he was deployed to Panama, Bosnia-Herzegovina, Afghanistan, and Iraq, earning two Bronze Star Medals for leadership, a Meritorious Service Medal, four Army Commendation Medals, four Army Achievement Medals, and a Humanitarian Assistance Medal.

121. Lieutenant Berg received an honorable discharge.

122. Lieutenant Berg joined the Philadelphia Police Department in March 2008 as part of Academy Class 353-C.

123. On Lieutenant Berg's second day at the Academy, he was appointed Platoon Leader after taking initiative to organize his peers—a leadership position he maintained throughout the academy.

124. Lieutenant Berg was promoted to sergeant in March 2016 and assigned to the 19th District in West Philadelphia, where he supervised patrol operations for up to twenty officers per shift.

125. Lieutenant Berg later transferred to the Police Radio Unit, where he oversaw six corporals and approximately 93 civilian dispatchers.

126. Lieutenant Berg was selected by Deputy Commissioner Christine Coulter to lead the Police Headquarters Security Unit, commanding an 18-person unit responsible for maintaining 24-hour security over three shifts.

127. Lieutenant Berg was promoted to lieutenant in 2023 and assigned to the Police Radio Unit as the administrative lieutenant at the request of former Deputy Commissioner Dennis Wilson and Chief Inspector Cochrane.

128. Lieutenant Berg has been responsible for supervising a civilian staff of 83 911 dispatchers, two sergeants, and six corporals, while assisting in managing a total workforce of 251 personnel.

129. Lieutenant Berg currently serves as project manager for the development of a Rapid Video Response Unit, a position for which he was selected by Deputy Commissioner Dahl-Campbell—the same official who later notified him that he was "not selected for promotion."

130. Lieutenant Berg holds an Associate's Degree in Criminal Justice from the Community College of Philadelphia (2017) and was completing a Bachelor's Degree in Criminal Justice from Rosemont College in December 2025, with acceptance to a Master's Degree program in Strategic Leadership.

131. Lieutenant Berg completed the Northwestern University School of Police Staff and Command program in June 2025 and the FBI-LEEDA Trilogy in November 2025, which includes the Supervisor Leadership Institute, Command Leadership Institute, and Executive Leadership Institute—nationally recognized benchmarks of excellence in law-enforcement leadership.

### D.    Plaintiff Joseph Musumeci

132.  Plaintiff Joseph Musumeci serves as a lieutenant in the Philadelphia Police Department.

133. Lieutenant Musumeci is a white male.

134. Lieutenant Musumeci was ranked 13th by test scores on the captain eligibility list with a score of 90.01.

135. Lieutenant Musumeci has served as a lieutenant with the Philadelphia Police Department since 2019.

136. Lieutenant Musumeci first joined the Philadelphia Police Department 2007.

137. Lieutenant Musumeci earned a bachelor's degree in criminal justice from Stockton College.

138. Lieutenant Musumeci has not been passed over for promotion in the past.

139.  Lieutenant Musumeci is aware of no open investigations by internal affairs with the Department.

140. Lieutenant Musumeci has no history of discipline, either pending or enforced.

141. Lieutenant Musumeci's annual performance reviews have always been satisfactory.

142. Lieutenant Musumeci has worked on patrol his whole career as a patrolman, sergeant, and lieutenant.

143. Lieutenant Musumeci was passed over for promotion in favor of two lower-scoring black men who ranked 14th and 16th on the captain eligibility list.

## VI.    The Candidates Who Were Bypassed For Promotion To Lieutenant

144. Plaintiffs Matthew Stankiewicz, Marc Monachello, and LeRoy Ziegler Jr. have dedicated years of service to the Philadelphia Police Department and demonstrated the qualifications necessary for promotion as measured by objective civil-service examination scores.

145. None of these plaintiffs have any disqualifying disciplinary record, ongoing investigation, or other disqualifying factor that could justify a decision to bypass them for promotion from sergeant to lieutenant.

### A.      Plaintiff Matthew Stankiewicz

146.  Plaintiff Matthew Stankiewicz serves as a sergeant in the Philadelphia Police Department.

147.  Sergeant Stankiewicz is a white male.

148.  Sergeant Stankiewicz was ranked second on the lieutenant eligibility list with a final civil-service examination score of 93.7772.

149.  Sergeant Stankiewicz was hired by the Philadelphia Police Department in December 2013.

150.  Sergeant Stankiewicz was promoted to the rank of sergeant in December 2019.

151.  Sergeant Stankiewicz earned a bachelor's degree in criminal justice from Holy Family University.

152.  Sergeant Stankiewicz has received specialized training, including crisis-intervention training, long-gun certification, and active-shooter training.

153.  Sergeant Stankiewicz's annual performance reviews have always been satisfactory.

154.  Sergeant Stankiewicz has had no major disciplinary actions. He received three minor infractions below the level of suspension, all of which occurred more than five years ago.

155.  Despite being ranked second on the lieutenant eligibility list, Sergeant Stankiewicz was interviewed during the first round of promotions in April 2025 but was not promoted. He was not called back for a second interview in the November 2025 promotion cycle, and the city cited the Rule of Five as the purported reason for both his non-promotion and his exclusion from the second round of interviews.

156.  Multiple individuals with substantially lower test scores were promoted to lieutenant over Sergeant Stankiewicz.

### B.    Plaintiff Marc Monachello

157. Plaintiff Marc Monachello serves as a sergeant in the Philadelphia Police Department.

158. Sergeant Monachello is a white male.

159. Sergeant Monachello was ranked 27th on the lieutenant eligibility list with a final civil-service examination score of 85.9574.

160. Sergeant Monachello earned a bachelor's degree in criminal justice from Shippensburg University.

161. Sergeant Monachello has been a sergeant for over eight years.

162. Sergeant Monachello is in his 16th year with the Philadelphia Police Department.

163. Sergeant Monachello has always been on patrol with the Police Department.

164. Sergeant Monachello's annual performance reviews have always been positive.

165. Six individuals with lower test scores were promoted to lieutenant over Sergeant Monachello, three of whom were black.

166. Sergeant Monachello currently works on a shift under Lieutenant Kathleen Momme, a female who was promoted to lieutenant over Sergeants Monachello and Ziegler.

### C.    Plaintiff LeRoy Ziegler Jr.

167. Plaintiff LeRoy Ziegler Jr. serves as a sergeant in the Philadelphia Police Department.

168. Sergeant Ziegler is a white male.

169. Sergeant Ziegler was ranked 28th on the lieutenant eligibility list with a final civil-service examination score 85.8926.

170. Sergeant Ziegler was passed over for promotion to lieutenant in favor of candidates with lower test scores.

171. Sergeant Ziegler has 18 years on the job.

172. Sergeant Ziegler has received positive annual performance reviews.

173. Sergeant Ziegler received a commendatory citation from the Philadelphia Police Department in April 2023 that "acknowledges the exemplary dedication to duty and outstanding performance as a member of the Philadelphia Police Department." The commendatory citation was signed by the police commissioner.

174. Sergeant Ziegler received an official commendation for merit, which recognized his performance in a March 2023 incident, signed by the police commissioner, that recognized his "dedication and professionalism, which [Ziegler] demonstrated is in keeping with the high standards and ethics of law enforcement."

175. Sergeant Ziegler's November 2025 evaluation by Lieutenant DeAnthonis Edwards, who directly supervised Ziegler for more than three years, stated that "he has proven to be extremely reliable in both leading and directing his officers."

176. The same evaluation states that Ziegler "submits all paperwork in a timely manner and resolves all issues that arise with his officers before it comes to [Lieutenant Edwards's] attention. Sergeant Ziegler displays a calm demeanor in hostile situations. [Sergeant Ziegler] will be an asset in any district or unit within the Philadelphia Police Department."

## VII.  The Candidate Bypassed For Promotion To Chief Inspector

### A.    Inspector Robert Ritchie

177. Inspector Robert Ritchie has been a member of the Philadelphia Police Department since 1996 and currently holds the rank of Inspector.

178. Inspector Ritchie is a white male.

179. Inspector Ritchie was seeking promotion to Chief Inspector, the highest-ranking civil-service position below the appointed positions, such as Police Commissioner.

180. Inspector Ritchie received a perfect score on the Chief Inspector promotional examination.

181. Inspector Ritchie was tied with four other candidates who received equal scores. Because all five candidates were tied, they were ranked from 1 to 5 based on the order of their application. Inspector Ritchie's ranking was 3.

182. The City of Philadelphia's past practice was to promote all tied candidates. However, in May 2025, the defendants bypassed the first-ranked candidate and instead promoted the second-ranked candidate, Nicholas Smith, a black male.

183. During the subsequent round of promotions in November 2025, Inspector Ritchie was again passed over, this time in favor of Matthew Gillespie, a white male.

184. Inspector Ritchie has received numerous departmental commendations, including one for Bravery and another for Heroism.

185. In 2001, Inspector Ritchie received the Commonwealth of Pennsylvania State Senate Award for Bravery.

186. In 2012, Inspector Ritchie received the Citizens Crime Commission Award for Heroism.

187. Inspector Ritchie earned an Associate of Liberal Arts, a Bachelor of Science in Public Safety Administration, a Master of Science in Emergency Management Administration, a Master of Science in Homeland Security, and a Doctorate in Criminal Justice.

188. Inspector Ritchie earned two post-graduate certificates: Global Security and Terrorism Studies; and School Security & Safety Administration.

189. Inspector Ritchie is a graduate of class #297 of the School of Police Staff & Command at Northwestern University, where he served as class Vice-President.

190. Upon graduation from Northwestern University, Inspector Ritchie was awarded the prestigious Franklin Kreml Award.

191. Inspector Ritchie is also a graduate of the Police Supervisory In-Service Training Program (POSIT) and the Advanced Police Executive Development Training Program (POLEX) at Pennsylvania State University.

192. In cooperation with fellow members of Fairleigh Dickinson University, Inspector Ritchie developed the Executive Leadership Program for Public Safety Personnel, which began in February 2012 at the School of Administrative Science.

193. Inspector Ritchie has been an Adjunct Instructor at Fairleigh Dickinson University since 2009, teaching courses at both the undergraduate and graduate levels.

194. Inspector Ritchie was passed over for promotion to Chief Inspector in favor of less-qualified candidates despite having a perfect score on the civil-service examination and extensive qualifications.

## VIII. EEOC And Related Administrative Filings

195. On or about November 26, 2025, Lieutenant Christopher Bloom filed a charge of discrimination on the basis of race with the EEOC, with Charge No. 530-2026-01497, against the Philadelphia Police Department that occurred between the dates of November 3, 2025, and November 26, 2025.

196. On or about November 26, 2025, Lieutenant Joseph Musumeci filed a charge of discrimination on the basis of race with the EEOC, with Charge No. 530-2026-01499, against the Philadelphia Police Department that occurred between the dates of November 3, 2025, and November 26, 2025.

197. On or about November 29, 2025, Lieutenant Kollin Berg filed a charge of discrimination on the basis of race with the EEOC, with Charge No. 530-2026-01520, against the Philadelphia Police Department that occurred between the dates of November 3, 2025, and November 28, 2025.

198. On or about March 27, 2026, Sergeant Matthew Stankiewicz filed a charge of discrimination on the basis of race with the EEOC, with Charge No. 530-2026-05072, against the Philadelphia Police Department that occurred between the dates of November 3, 2025, and March 17, 2026.

199. On or about November 26, 2025, Sergeant LeRoy Ziegler Jr. filed a charge of discrimination on the basis of race with the EEOC, with Charge No. 530-2026-01500, against the Philadelphia Police Department that occurred between the dates of November 3, 2025, and November 26, 2025.

200. On or about November 28, 2025, Sergeant Marc Monachello filed a charge of discrimination on the basis of race with the EEOC, with Charge No. 530-2026-01521, against the Philadelphia Police Department that occurred between the dates of October 30, 1983, and November 28, 2025.

201. On or about March 27, 2026, Lieutenant Andrew Furtak filed a charge of discrimination on the basis of race with the EEOC, with Charge No. 530-2026-05071, against the Philadelphia Police Department that occurred between the dates of November 3, 2025, and March 17, 2026.

202. On or about March 28, 2026, Inspector Robert Ritchie filed a charge of discrimination on the basis of race with the EEOC, with Charge No. 530-2026-05108, against the Philadelphia Police Department that occurred between the dates of May 1, 2025, and March 17, 2026.

203. Each plaintiff's charge named the Philadelphia Police Department as the respondent.

204. On January 22, 2026, the United States Department of Justice, Civil Rights Division, Employment Litigation Section, issued right-to-sue letters to each plaintiff on behalf of the EEOC.

205. Because plaintiffs' charges alleged Title VII violations against a city agency, the right-to-sue letters were issued by the Department of Justice rather than the

EEOC, consistent with Title VII's procedures for claims against state and local governmental employers.

206. Plaintiffs Bloom, Berg, Musumeci, Monachello, and Ziegler received their right-to-sue letters on or about January 22, 2026. *See* Exhibits 1–5.

207. This action was initially filed within 90 days of the original plaintiffs' (Bloom, Berg, Musumeci, Monachello, and Ziegler) receipt of their right-to-sue letters.

208. Plaintiff Furtak received his right-to-sue letter on or about April 13, 2026. *See* Exhibit 6.

209. Plaintiff Stankiewicz received his right-to-sue letter on or about May 19, 2026. *See* Exhibit 7.

210. Plaintiff Ritchie received his right-to-sue letter on or about May 19, 2026. *See* Exhibit 8.

211. This amended complaint is filed within 90 days of the added plaintiffs' (Stankiewicz, Furtak, and Ritchie) receipt of their right-to-sue letters.

212. The plaintiffs have satisfied all conditions precedent to bringing this Title VII action and have exhausted all required administrative remedies.

213. The plaintiffs' claims under 42 U.S.C. § 1981 do not require administrative exhaustion and are timely filed within the applicable four-year statute of limitations.

## CLASS-ACTION ALLEGATIONS

214. The plaintiffs bring this action on behalf of themselves and on behalf of two classes under Fed. R. Civ. P. 23(b)(1)(A), (b)(1)(B), (b)(2) and (b)(3). The damages class includes all white male employees of the City of Philadelphia Police Department who, since November 2021 (when the "Rule of Two" was eliminated), were eligible for promotion under civil-service rules, ranked in a position from which they would have been promoted under the former "Rule of Two," but were bypassed for

promotion under the "Rule of Five" in favor of a candidate with lower scores on the civil service examination. The injunctive-relief class includes all white male employees of the City of Philadelphia Police Department who are currently seeking promotion or will seek promotion in the future.

215. The number of persons in the classes makes joinder of the individual class members impractical.

216. The single-filing rule allows class members who have not filed their own EEOC charge to join the class action because the named Plaintiffs have filed a timely EEOC charge alleging class-wide discrimination.

217. There are numerous questions of law and fact common to each member of the classes. These include:

a. Whether the defendants' adoption and implementation of the "Rule of Five" were motivated by an intent to discriminate on the basis of race and sex;

b. Whether the defendants' use of the "Rule of Five" to bypass higher-ranked white male candidates in favor of lower-ranked minority and female candidates constitutes unlawful race and sex discrimination;

c. Whether the defendants' DEI policies, executive orders, and promotional practices violate Title VII, Section 1981, the Pennsylvania Human Relations Act, the Pennsylvania Constitution, and the Equal Protection Clause; and

d. Whether and to what extent the class members are entitled to declaratory and injunctive relief.

218. The plaintiffs' claims are typical of the claims of the class because, like all class members, the plaintiffs are white male city employees who were eligible for promotion and were ranked in a position where they were bypassed under the "Rule of Five" in favor of less-qualified candidates.

219. The plaintiffs will fairly and adequately protect the interests of the class. The plaintiffs have no interests antagonistic to or in conflict with other class members, and the plaintiffs have retained counsel experienced in employment discrimination and civil-rights class actions.

220. A class action can be maintained under Rule 23(b)(1)(A) because separate actions by class members could risk inconsistent adjudications on the underlying legal issues.

221. A class action can be maintained under Rule 23(b)(1)(B) because an adjudication determining the legality of the city's DEI hiring and promotion practices will, as a practical matter, be dispositive of the interests of all class members.

222. A class action can be maintained under Rule 23(b)(2) because the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

223. A class action can be maintained under Rule 23(b)(3) because the common questions of law and fact identified in the complaint predominate over any questions affecting only individual class members. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other things, all class members are subjected to the same violation of their constitutional rights, but the amount of money involved in each individual's claim would make it burdensome for class members to maintain separate actions.

## CAUSES OF ACTION

### CLAIM 1: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e *et seq.* (RACE AND SEX DISCRIMINATION)

224. Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms,

conditions, or privileges of employment" because of that individual's race or sex. *See* 42 U.S.C. § 2000e-2(a).

225. The city of Philadelphia and the Philadelphia Police Department are "employers" within the meaning of Title VII.

226. The plaintiffs are "employees" within the meaning of Title VII.

227. The defendants unlawfully discriminated against the plaintiffs because of their race and sex by using the "Rule of Five" to deny them promotions to captain and lieutenant while promoting minority candidates and female candidates with lower civil-service examination scores.

228. The sex-discrimination claims are "like or reasonably related" to the race discrimination claims in the EEOC charges and would reasonably be expected to grow out of the EEOC's investigation.

229. The defendants' DEI promotional policies, including the "Rule of Five," constitute intentional race and sex discrimination in violation of Title VII.

230. The plaintiffs are members of protected classes under Title VII, as both white employees and male employees are protected from unlawful race and sex discrimination. *See Ames v. Ohio Dep't of Youth Services*, 605 U.S. 303, 305 (2025); *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 278–79 (1976).

231. The plaintiffs applied for and were qualified for promotion, as demonstrated by their positions on the eligibility lists and their civil-service examination scores.

232. The plaintiffs were rejected for promotion despite their superior qualifications.

233. The promotional positions were filled by individuals outside the plaintiffs' racial group and sex who had lower civil-service examination scores.

234. The defendants' conduct shows that they used race and sex as motivating factors in promotional decisions in violation of Title VII.

235. The defendants' conduct constitutes a pattern or practice of intentional race and sex discrimination against white male candidates in promotional decisions.

236. By considering race and sex in making promotions, the defendants engaged in unlawful discrimination under Title VII.

237. The defendants have offered no legitimate, non-discriminatory reason for bypassing Plaintiffs that is not itself race-based or sex-based.

238. As a direct and proximate result of the defendants' unlawful conduct, the plaintiffs have suffered damages including lost wages, lost benefits, lost pension contributions, emotional distress, humiliation, and other compensatory damages.

239. The plaintiffs satisfy all applicable administrative prerequisites to sue under Title VII.

240. The defendants' conduct was willful or undertaken with reckless indifference to the plaintiffs' federally protected rights, entitling the plaintiffs to all remedies available under Title VII, including back pay, front pay or reinstatement, compensatory and punitive damages (where permitted), attorneys' fees, costs, and pre- and post-judgment interest.

### CLAIM 2: VIOLATION OF 42 U.S.C. § 1981
### (RACE DISCRIMINATION IN CONTRACTING)

241. 42 U.S.C. § 1981 gives all persons within the jurisdiction of the United States the same right to make and enforce contracts as is enjoyed by white citizens.

242. The right to make and enforce contracts includes the right to promotion within an employment relationship.

243. Section 1981 protects individuals of all races from intentional race discrimination in hiring and promotion decisions, including white individuals.

244. The plaintiffs' employment with the city of Philadelphia constitutes a contractual relationship protected by section 1981.

245. The defendants intentionally discriminated against the plaintiffs because of their race by denying them promotions to captain and lieutenant while promoting less-qualified minority candidates.

246. The defendants' race-conscious promotional policies, including the "Rule of Five," constitute intentional race discrimination in violation of section 1981.

247. Defendant Police Commissioner Bethel, as Police Commissioner, has final authority over promotional decisions and approved or directed the decision to pass over the plaintiffs in favor of minority candidates with lower scores.

248. Defendant Police Deputy Commissioner Dahl-Campbell, as Deputy Commissioner of Organizational Services, implemented the discriminatory promotional decisions and notified the plaintiffs of their non-selection.

249. Defendant Director of Human Resources Jones, as Director of Human Resources, administered the civil-service examination and eligibility-list system and implemented the "Rule of Five" policy that enabled the discriminatory promotional decisions.

250. As a direct and proximate result of the defendants' unlawful conduct, the plaintiffs have suffered damages including lost wages, lost benefits, lost pension contributions, emotional distress, humiliation, and other compensatory damages.

251. The plaintiffs are entitled to declaratory and injunctive relief, compensatory damages, punitive damages (where permitted) against the defendants, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

252. The defendants' conduct was willful and in reckless disregard of Plaintiffs' federally protected rights, entitling them to all remedies available at law and in equity, including compensatory and punitive damages (where permitted), attorneys' fees, costs, and pre- and post-judgment interest.

## CLAIM 3: PENNSYLVANIA HUMAN RELATIONS ACT, 43 PA. CONS. STAT. § 955(a) (RACE AND SEX DISCRIMINATION)

253. The Pennsylvania Human Relations Act prohibits employers from refusing to hire or employ or barring or discharging from employment any individual because of his race or sex, and prohibits discrimination in terms, conditions, or privileges of employment because of race or sex.

254. Under the Pennsylvania Human Relations Act, the city of Philadelphia and the Philadelphia Police Department both qualify as employers under 43 Pa. Cons. Stat. § 954(b), and the other individual defendants acted as agents under 43 Pa. Cons. Stat. § 954(a) in selecting candidates for promotions.

255. The defendants violated the Pennsylvania Human Relations Act by denying the plaintiffs promotions because of their race and sex.

256. The defendants' DEI hiring and promotional policies, including the "Rule of Five," constitute intentional race and sex discrimination in violation of the Pennsylvania Human Relations Act.

257. As a direct and proximate result of Defendants' unlawful conduct, the plaintiffs have suffered damages, including lost wages, lost benefits, lost pension contributions, emotional distress, humiliation, and other compensatory damages.

258. Similarly situated individuals outside the plaintiffs' protected classes were treated more favorably in the promotional process.

259. The plaintiffs are entitled to declaratory and injunctive relief, compensatory damages, and reasonable attorneys' fees and costs.

260. The plaintiffs seek all relief available under the Pennsylvania Human Relations Act, including back pay, front pay or reinstatement, compensatory damages, punitive damages (where permitted), attorneys' fees and costs where authorized, and pre- and post-judgment interest.

## Claim 4: Violation of Pa. Const. Article I, §§ 26, 28, 29
### (Race And Sex Discrimination)

261. Article I, § 26 of the Pennsylvania Constitution prohibits any political subdivision from denying any person a civil right. ("Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right.").

262. Article I, § 28 of the Pennsylvania Constitution prohibits the abridgement of any right because of a person's sex. ("Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual.").

263. Article I, § 29 of the Pennsylvania Constitution prohibits the abridgement of any right because of a person's race or ethnicity. ("Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the race or ethnicity of the individual.").

264. The defendants are violating the Pennsylvania Constitution by establishing, maintaining, and using a promotion policy that discriminates on the basis of race or sex.

## Claim 5: Equal-Protection Clause
### (Race And Sex Discrimination)

265. The Supreme Court interprets the Fourteenth Amendment's Equal Protection Clause to prohibit racial discrimination by state or local government entities. *See Johnson v. California*, 543 U.S. 499 (2005); *Shaw v. Hunt*, 517 U.S. 899 (1996) ("Racial classifications are antithetical to the Fourteenth Amendment, whose central purpose was to eliminate racial discrimination emanating from official sources in the States."); *Palmore v. Sidoti*, 466 U.S. 429 (1984) ("A core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race.").

266. The Supreme Court also interprets the Equal Protection Clause to prohibit sex discrimination by state and local governments absent an "exceedingly persuasive

justification." *United States v. Virginia*, 518 U.S. 515, 531 (1996); *see also id.* ("Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action.").

267. The defendants have violated and are violating the Supreme Court's equal-protection doctrine by applying different standards for promotion based on their race and sex of the applicant.

268. The defendants intentionally discriminated against the plaintiffs because of their race by denying them promotions while promoting less-qualified black candidates with lower civil-service examination scores.

269. The defendants intentionally discriminated against the plaintiffs because of their sex by denying them promotions while promoting less-qualified female candidates with lower civil-service examination scores.

270. The defendants' DEI hiring and promotional policies, including the "Rule of Five," cannot survive strict scrutiny because they are not narrowly tailored to serve a compelling governmental interest.

271. The defendants' sex DEI hiring and promotional policies, including the "Rule of Five," cannot survive intermediate scrutiny because they do not serve an important governmental objective and are not substantially related to the achievement of any such objective. Nor is there an "exceedingly persuasive justification" for giving women discriminatory preferences in city hiring and promotion.

272. The defendants have no legitimate justification, let alone a compelling or important governmental interest, for using race or sex as factors in promotional decisions, especially when federal anti-discrimination statutes categorically ban employment discrimination on account of race or sex.

273. The plaintiffs assert this claim under 42 U.S.C. § 1983.

## CLAIM 6: CLASSWIDE DECLARATORY AND INJUNCTIVE RELIEF

274. The defendants' adoption and implementation of the Rule of Five, along with Executive Order No. 1-16, Executive Order No. 1-20, Executive Order No. 6-23, Resolution No. 220193, the DEI Template Plan, the Philadelphia Police Department's FY 2023 DEI Plan, the FY22 Racial Equity Cohort Departmental Action Frameworks, the 30x30 Initiative, and other DEI hiring and promotion policies, constitute a systematic pattern and practice of intentional race and sex discrimination against white male employees.

275. The class members have been and continue to be injured by the defendants' unlawful policies and practices.

276. The injunctive-relief class members are entitled to declaratory and injunctive relief prohibiting the defendants from continuing to apply these discriminatory policies and practices.

## CLAIM 7: CLASSWIDE DAMAGES

277. As a direct and proximate result of the defendants' unlawful conduct, the damages class members have suffered lost wages, lost benefits, lost pension contributions, emotional distress, humiliation, and other compensatory damages.

278. The plaintiffs satisfied all applicable administrative prerequisites to sue under Title VII.

279. The defendants' conduct was willful and/or undertaken with reckless indifference to class members' federally protected rights, entitling class members to all remedies available under Title VII, including back pay, front pay or reinstatement, compensatory and punitive damages (where permitted), attorneys' fees, costs, and pre- and post-judgment interest.

## DEMAND FOR RELIEF

280. The plaintiffs respectfully request that the court:

a.    certify the classes described in paragraph 214;

b.    declare that the defendants' promotional policies and practices, including the "Rule of Five" policy as applied, violate Title VII, 42 U.S.C. § 1981, the Pennsylvania Human Relations Act, the Pennsylvania Constitution, and the Equal Protection Clause;

c.    permanently enjoin the defendants from using or considering race or sex in hiring or promotional decisions;

d.    permanently enjoin the defendants from applying the "Rule of Five";

e.    permanently enjoin the defendants from enforcing, implementing, or applying Executive Order No. 1-16, Executive Order No. 1-20, Executive Order No. 6-23, Resolution No. 220193, the DEI Template Plan, the Philadelphia Police Department's FY 2023 DEI Plan, the FY22 Racial Equity Cohort Departmental Action Frameworks, the 30x30 Initiative, and any other policy, program, or practice that uses or considers race or sex as a factor in hiring, promotion, or other employment decisions;

f.    order the defendants to promote Lieutenants Bloom, Furtak, Berg, and Musumeci to the rank of captain, Sergeants Stankiewicz, Monachello, and Ziegler to the rank of Lieutenant, and Inspector Ritchie to the rank of Chief Inspector, with retroactive seniority, pay, and benefits to the date of their respective promotional decisions in May 2025 (for Inspector Ritchie) and November 2025 (for all other plaintiffs)

g.    award back pay representing the difference between the plaintiffs' actual compensation and the compensation they would have received had they been promoted in May 2025 (for Inspector Ritchie) and November 2025 (for all other plaintiffs)

h.    award front pay representing future lost compensation to the extent that promotion with retroactive benefits is not feasible;

i.    award compensatory damages for emotional distress, humiliation, and other non-economic injuries;

j.    award punitive damages to the extent permitted by Title VII, 42 U.S.C. § 1981a(b)(1), and 42 U.S.C. § 1981, for any conduct carried out with malice or reckless indifference to federally protected rights;

k.    award pre-judgment and post-judgment interest;

l.      award costs, expert fees, and attorneys' fees under 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988; and

m.      award all other relief that the Court deems just, proper, or equitable.

Respectfully submitted.

GENE P. HAMILTON*
Virginia Bar No. 80434
President and General Counsel
NICHOLAS R. BARRY*
Tennessee Bar No. 031963
Senior Counsel
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, D.C. 20003
(202) 964-3721 (phone)
gene.hamilton@aflegal.org
nicholas.barry@aflegal.org

* admitted *pro hac vice*

Dated: June 18, 2026

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Pennsylvania Bar No. 91505
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

WALTER S. ZIMOLONG
Pennsylvania Bar No. 89151
Zimolong LLC
Post Office Box 552
Villanova, Pennsylvania 19085-0552
(215) 665-0842 (phone)
wally@zimolonglaw.com

*Counsel for the Plaintiffs
and the Proposed Classes*

## CERTIFICATE OF SERVICE

I certify that on June 18, 2026, I served this document through CM/ECF upon:

CHRISTOPHER D'AMORE
Senior Attorney
Labor and Employment Unit
City of Philadelphia Law Department
1515 Arch Street, 14th floor
Philadelphia, Pennsylvania 19102
(215) 683-0062 (office)
(267) 251-6830 (cell)
christopher.damore@phila.gov

*Counsel for the Defendants*

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for the Plaintiffs*
*and the Proposed Classes*